[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-15503
_____

D.C. Docket No. 2:09-cv-01041-RDP

JANE DOE, et al.,

Plaintiffs – Appellants,

versus

DRUMMOND COMPANY, INC., et al.,

Defendants – Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(March 25, 2015)

Before WILSON and ROSENBAUM, Circuit Judges, and SCHLESINGER,[*] District Judge.

_____

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

WILSON, Circuit Judge:

Following a prolonged period of civil unrest in the Republic of Colombia, plaintiffs-appellants (Plaintiffs) brought the instant action on behalf of over one hundred Colombian citizens killed by violent paramilitaries in the ensuing armed conflict.  Plaintiffs, the legal heirs of the decedents, filed suit in federal court against numerous defendants-appellees, including a supranational coal mining company based in Alabama, its subsidiary, and several of its high-ranking corporate officers (collectively, Defendants).  Averring that Defendants engaged the paramilitaries, known as the Autodefensas Unidas de Colombia (AUC), to eliminate suspected guerilla groups from around the company's mining operations in Colombia, Plaintiffs contend their innocent decedents were incidental casualties of Defendants' arrangement with the AUC.

Specifically, Plaintiffs allege that the AUC, acting at the behest and on behalf of Defendants, committed a series of international law violations, including extrajudicial killings, war crimes, and crimes against humanity, against Plaintiffs' family members in Colombia.  Claiming that Defendants aided and abetted, conspired with, and entered into an agency relationship with the AUC, Plaintiffs brought suit under the Alien Tort Statute (ATS), 28 U.S.C. § 1350; the Torture Victim Protection Act of 1991 (TVPA), Pub. L. No. 102-256, 106 Stat. 73 (codified at 28 U.S.C. § 1350 note); and Colombia's wrongful death laws.

2

The district court found that the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. ___, 133 S. Ct. 1659 (2013), required dismissal of Plaintiffs' ATS claims, and the court entered summary judgment in Defendants' favor on those claims.  In a series of opinions, the district court also dismissed Plaintiffs' TVPA claims on summary judgment.  Further, the district court declined to exercise supplemental jurisdiction over Plaintiffs' wrongful death claims under Colombian law and denied Plaintiffs' motion to vacate the district court's grants of summary judgment, which Plaintiffs sought in order to proceed with their Colombian wrongful death claims.

Plaintiffs appeal each of the district court's opinions and the holdings contained therein.  We provide a general background of the proceedings below before turning to the issues presented on appeal by Plaintiffs' claims under the ATS, the TVPA, and Colombian law, respectively.  After careful consideration of the parties' briefs and those filed by the amici, the record on appeal, and the relevant legal authorities, we affirm the district court's rulings.

## I. PROCEDURAL BACKGROUND

On May 7, 2009, Plaintiffs filed a complaint against Defendants for equitable relief and damages under the ATS, the TVPA, and the wrongful death laws of Colombia.  Defendants include Drummond Company, Inc., a closely-held coal mining corporation based in Alabama (Drummond Company); Drummond

3

Ltd., Drummond Company's wholly-owned subsidiary in charge of day-to-day mining operations in Colombia; and two corporate officers, James Michael Tracy and Augusto Jimenez.[1]  Drummond Company and Drummond Ltd. are incorporated in and maintain their principal place of business in Alabama. Plaintiffs, who are citizens of Colombia and resided there at time of suit, used the pseudonyms "Jane Doe" and "Peter Doe" in their initial filing.

Before the district court, Plaintiffs averred that Defendants provided substantial financial and material support to the violent paramilitaries within the AUC from 1996 until 2006, when the AUC demobilized.  They further contended that Defendants continued to provide this support despite being fully aware that the AUC was designated a foreign terrorist organization by the U.S. government in 2001.  The complaint alleged that Defendants paid the AUC—through both direct payments to the AUC as well as indirect payments funneled to the AUC through the Colombian military in the form of unrestricted funds—to provide "security" for Drummond Company's mining operations and facilities.

Defendants' security objectives allegedly included driving competing, non-AUC guerilla fighters out of the area surrounding Defendants' mining operations

---

[1] Tracy began working for Drummond Company in 1975 and thus has had various roles and titles within the corporation, including President and Chief Operating Officer of Drummond Ltd., and, at various times, Vice President of Special Projects, Vice President and Assistant to the CEO, and President of Mining for Drummond Company.  As pertinent here, he was in charge of mining and security in Colombia.  Jimenez served as President of Drummond Ltd.'s Colombian branch, supervising the development and implementation of security plans.  Tracy is a U.S. citizen, whereas Jimenez is a Colombian citizen.

4

and rail line and ensuring that the civilian population in and around that area would not provide any support to guerilla groups or rebels.  Incidental to these objectives, the purported arrangement between Defendants and the AUC resulted in the AUC killing numerous local civilians.  Asserting that each of the civilian deaths at issue was an extrajudicial killing in violation of the "law of nations" under the ATS and in violation of the TVPA, Plaintiffs contended Defendants were liable because the AUC paramilitaries carried out the atrocities as Defendants' agents and Defendants conspired with and aided and abetted the AUC.

Defendants moved to dismiss Plaintiffs' initial complaint on several grounds.  The district court refused to dismiss the complaint entirely; instead, it permitted Plaintiffs to amend in order to "more carefully craft their complaint" in accordance with the court's stated findings.  However, the court did find that Plaintiffs' wrongful death claims would raise novel and complex issues of Colombian law.  The district court thus declined to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' wrongful death claims, regardless of whether Plaintiffs properly alleged federal claims under the ATS and TVPA in their amended complaint.

Plaintiffs' amended complaint added a claim for "crimes against humanity" under the ATS in addition to their existing claims under the ATS and the TVPA.  In response, Defendants renewed their motion to dismiss.  The district court

5

granted Defendants' motion in part, dismissing the crimes against humanity claim on the grounds that the attacks by the AUC were not attacks on a civilian population. Plaintiffs then filed a second amended complaint removing the pseudonyms and disclosing their identities.[2] The complaint identified in detail each Plaintiff, his or her relationship to the deceased, and the facts surrounding the death of the decedent at the hands of the AUC.[3]

On September 29, 2011, Plaintiffs filed a third amended complaint, which serves as the operative complaint in this action, and the parties proceeded to discovery. Shortly thereafter, the Supreme Court listed *Kiobel v. Royal Dutch Petroleum Co.*—a case involving ATS claims—for reargument on the question of "[w]hether and under what circumstances the [ATS] allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States." *See Kiobel v. Royal Dutch Petroleum Co.*, 565 U.S. ___, ___, 132 S. Ct. 1738, 1738 (2012) (mem.) (internal quotation marks omitted) (calendaring the case for reargument). Defendants moved for a

---

[2] Plaintiff "Jane Doe" was revealed to be Claudia Balcero Giraldo, the legal representative and wrongful death beneficiary of the estate of her husband. When the second amended complaint was filed, the case caption was restyled *Giraldo v. Drummond Company*, and the district court referred to Plaintiffs as the "Balcero plaintiffs." On appeal, this case retains its original title.

[3] Plaintiffs claim they are all lawful legal representatives for and beneficiaries of the decedents. Since a recitation of the names, circumstances, and relationships of each individual Plaintiff and his or her decedent is not necessary to the disposition of the legal claims at issue, we will not recount the specific details provided by and about the respective Plaintiffs.

6

stay of proceedings pending the Supreme Court's decision, but the district court denied the motion.

At the close of discovery, each of the Defendants moved for summary judgment. During the pendency of those motions, the Supreme Court issued its decision in *Kiobel*, 569 U.S. ___, 133 S. Ct. 1659. After ordering and considering supplemental briefing by the parties on the impact of *Kiobel* on the instant action, the district court dismissed Plaintiffs' ATS claims against all Defendants in a series of separate opinions and accompanying orders.

As for Plaintiffs' TVPA claims, in the same series of opinions, the district court found that the Supreme Court's decision in *Mohamad v. Palestinian Authority*, 566 U.S. ___, 132 S. Ct. 1702 (2012), required dismissal of the claims against any corporate entities; thus, the district court dismissed Plaintiffs' claims against Drummond Company and Drummond Ltd. The court also granted the summary judgment motions filed by the individual defendants, Tracy and Jimenez, thereby dismissing Plaintiffs' remaining TVPA claims.

With all claims dismissed and the litigation at a close, Plaintiffs moved to vacate the summary judgment orders. Plaintiffs argued that the judgments should be vacated to permit limited discovery regarding actions taken by Defendants in the United States or, in the alternative, to allow Plaintiffs to amend their complaint for a fourth time to assert diversity jurisdiction and in that way pursue their

wrongful death claims under Colombian law before the district court. The court denied Plaintiffs' motion, and this appeal ensued.

## II. ALIEN TORT STATUTE CLAIMS

On appeal, we are called upon to determine whether Plaintiffs' ATS claims—that U.S. citizens, acting in part from within the United States, aided and abetted or otherwise contributed to human rights violations committed outside the United States—sufficiently "touch and concern" the territory of the United States so that we have jurisdiction to consider Plaintiffs' claims.

The "touch and concern" standard is set forth in *Kiobel*, wherein the Supreme Court held that ATS claims are subject to the presumption against extraterritoriality, a judicially created canon of statutory interpretation that assumes U.S. law does not apply outside of the United States. *See* 569 U.S. at ___, 133 S. Ct. at 1664, 1669. Pursuant to *Kiobel*, the presumption constrains federal courts' exercise of jurisdiction over ATS claims that have an extraterritorial component unless the claims at issue "touch and concern the territory of the United States . . . with sufficient force to displace the presumption." *See id.* This court's prior interpretations of *Kiobel* control our determination as to whether Plaintiffs' claims meet this standard.

Two recent decisions of this court, issued over the span of a few months, have addressed our jurisdiction over ATS cases after *Kiobel*: *Baloco v. Drummond*

8

*Co.* (*Baloco II*)[4] and *Cardona v. Chiquita Brands International, Inc.*[5]  Both decisions impose jurisdictional constraints that are not required by the Court's holding in *Kiobel*, but they also leave unanswered a considerable number of questions as to this circuit's interpretation and application of *Kiobel*'s operative language.

Still, the application of our prior opinions to this case compels a finding that, on the facts before us, Plaintiffs' claims do not "touch and concern" the territory of the United States, or rather that they do not do so with sufficient force to displace the presumption and permit jurisdiction.  For these reasons and those set forth in greater detail below, we are obliged to find that neither this court nor the district court have jurisdiction over Plaintiffs' claims brought under the ATS.

## A. Legal Background

Because the Supreme Court's decision in *Kiobel* significantly altered the landscape of ATS jurisprudence, a discussion of the relevant legal background is necessary.  We look first to the statute itself before addressing the Court's decision in *Kiobel*.  We then consider guidance from the few circuits that have considered similar claims post-*Kiobel*, including the two controlling decisions of this court,

---

[4] 767 F.3d 1229 (11th Cir. 2014) (appeal following remand); *see Baloco ex rel. Tapia v. Drummond Co.* (*Baloco I*), 640 F.3d 1338, 1345 (11th Cir. 2011) (reversing dismissal of plaintiffs' case and remanding for proceedings consistent with opinion).

[5] 760 F.3d 1185 (11th Cir. 2014).

which inform our interpretation of *Kiobel* and direct our discussion of the ATS claims currently before us.

## (1) The Alien Tort Statute

The ATS states in its entirety: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." [6]  28 U.S.C. § 1350.  By its terms, the ATS is a "strictly jurisdictional" statute.  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713, 124 S. Ct. 2739, 2755 (2004).

Due to its jurisdictional nature, the ATS does not provide an independent cause of action; instead, it grants jurisdiction to district courts "on the understanding that the common law [will] provide a cause of action for [a] modest number of international law violations."[7]  *Id.* at 724, 124 S. Ct. at 2761; *see Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008).  Consequently, the ATS empowers federal courts to recognize private claims under federal common law, when those claims sufficiently state an international law violation

---

[6] Not only is the ATS notoriously brief, but there is limited legislative history available to assist with its interpretation—it was originally enacted in 1789 as part of the Judiciary Act that established the then-new federal court system.  *See* Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 76–77 (codified as amended at 28 U.S.C. § 1350).

[7] Since the ATS does not create statutory claims, it is a bit of a misnomer to refer to "ATS claims."  More accurately, claims are brought under the ATS; that is, the ATS confers jurisdiction on the district courts over federal common law causes of action premised on "law of nations" violations.  "ATS claims" as used herein must be read to reflect this concept.

"with the requisite definite content and acceptance among civilized nations."

*Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1663 (internal quotation marks omitted).

The ATS will not confer jurisdiction on federal courts unless the requirements set forth in the statute are met: the plaintiff must be "(1) an alien, (2) suing for a tort, which was (3) committed in violation of international law." [8] *See Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005) (per curiam).  However, the explicit statutory requirements are not the only requirements for jurisdiction.  Some of the numerous additional jurisdictional predicates include, for example, whether liability on the part of the defendant and the plaintiffs' theory therefor are cognizable.  *See Mastafa v. Chevron Corp.*, 770 F.3d 170, 179–80 (2d Cir. 2014).

Here, such initial prerequisites appear to be satisfied: Plaintiffs are citizens of Colombia bringing a civil suit for the extrajudicial killings of their decedents. *See Romero*, 552 F.3d at 1316 (recognizing that claims for extrajudicial killings are actionable international law violations under the ATS).  Further, Plaintiffs may pursue their claims against both corporate and individual Defendants under the

---

[8] To be "in violation of international law" in the context of the ATS, the challenged action must violate the "law of nations."  The term "law of nations" is also used synonymously with "customary international law" in this context.  *See Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980) (discussing sources of "customary international law" in finding that "the law of nations" prohibits torture).

ATS, and those claims may be "based on direct and indirect theories of liability."[9] *See Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158 (11th Cir. 2005) (per curiam); *Romero*, 552 F.3d at 1315. However, our inquiry does not end there. Because aspects of Plaintiffs' claims occurred outside of the United States, we must address the jurisdictional predicate recently set forth in *Kiobel*: whether the presumption against extraterritoriality precludes subject matter jurisdiction over Plaintiffs' ATS claims.[10] *See Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1664–65, 1669; *Mastafa*, 770 F.3d at 179.

**(2) The Supreme Court's *Kiobel* Decision**

In *Kiobel*, the Court considered "whether and under what circumstances courts may recognize a cause of action under the [ATS], for violations of the law of nations occurring within the territory of a sovereign other than the United

---

[9] State action may also be required for ATS claims, although we have recognized that private defendants may be liable "under the law of nations, for some conduct, such as war crimes, regardless of whether they acted under color of law of a foreign nation." *Romero*, 552 F.3d at 1316. Here, the district court found that any state action requirement was met in Plaintiffs' initial pleadings due to the AUC's relationship with the Colombian government.

[10] The presumption—a canon of statutory interpretation applied "to discern whether an Act of Congress regulating conduct applies abroad"—normally presents a "merits question, not a question of jurisdiction." *See Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1664 (internal quotation marks omitted). As such, it was not readily applicable to ATS claims, since the ATS is an entirely jurisdictional statute that simply "allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *See id.* Indeed, "the ATS does not authorize the making of substantive U.S. law or its application abroad—the very 'sin' to which the presumption against extraterritoriality is addressed." *See* Ralph G. Steinhardt, *Determining Which Human Rights Claims "Touch and Concern" the United States: Justice Kennedy's* Filartiga, 89 Notre Dame L. Rev. 1695, 1701 (2014). *Kiobel* marks the first time the Supreme Court applied the presumption to a purely jurisdictional statute; previously, the Court applied the presumption only to substantive statutory regimes implemented by Congress, such as securities laws, labor laws, and antidiscrimination laws. *See id.* at 1696, 1701–02.

States."  569 U.S. at ___, 133 S. Ct. at 1662.  In a majority opinion authored by Chief Justice John Roberts, the Court found that the presumption against extraterritoriality applies to claims under the ATS, to "constrain courts considering causes of action that may be brought under the ATS."  *Id.* at 1664.

Applying the presumption to the claim before it, wherein foreign plaintiffs sought to hold foreign defendants liable under the ATS for exclusively foreign conduct, the Court held that, "[o]n *these* facts," the presumption precluded jurisdiction.  *See id.* at 1662–64, 1669 (emphasis added) (considering that "all the relevant conduct took place outside the United States" and finding "mere corporate presence" insufficient to support jurisdiction).

Thus, the *Kiobel* majority opinion answered the question before the Court in the negative, providing only "under what circumstances" a court may *not* recognize a cause of action under the ATS—that is, when the claim involves a foreign plaintiff suing a foreign defendant where "all relevant conduct" occurred on foreign soil (a so-called "foreign-cubed" case[11]).  The Court left open the possibility that courts may recognize other, non-foreign-cubed ATS claims, since

---

[11] *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 283 n.11, 130 S. Ct. 2869, 2894 n.11 (2010) (Stevens, J., concurring in the judgment) (describing foreign-cubed actions in the context of the presumption against extraterritoriality as applied to securities cases).  The Supreme Court recently confirmed that *Kiobel* precluded jurisdiction under the ATS with regard to a similarly foreign-cubed action.  *See Daimler AG v. Bauman*, 571 U.S. ___, ___, 134 S. Ct. 746, 750, 762–63 (2014) (considering "the authority of a court in the United States to entertain a claim brought by foreign plaintiffs against a foreign defendant based on events occurring entirely outside the United States" and noting that *Kiobel* had foreclosed plaintiffs' ATS claims).

13

the presumption against extraterritorial application of the ATS could be "displace[d]" by claims made under the statute that "touch and concern the territory of the United States . . . with sufficient force to displace the presumption." *See id.* at 1669.

We derive three functional rules from *Kiobel*. First, the presumption against extraterritoriality applies to ATS claims. Second, in order to displace the presumption for a claim brought under the ATS, the claim must touch and concern the territory of the United States with sufficient force. Third, if the presumption is *not* displaced, the court does not have jurisdiction under the ATS and cannot hear the matter. The application of these rules to the facts in *Kiobel* led to the narrow holding of the Supreme Court: when an ATS claim is brought against foreign defendants and all relevant conduct occurred outside the United States, the presumption is not displaced by the defendants' mere corporate presence within the United States.

The Court left important questions unresolved as to the application of these rules when claims are brought under different circumstances, especially with regard to what claims would displace the presumption and permit jurisdiction under the ATS. All three of the concurrences in *Kiobel* averred that the Court clearly and intentionally left these questions unanswered. *See id.* (Kennedy, J., concurring) ("[T]he Court is careful to leave open a number of significant

14

questions regarding the reach and interpretation of the [ATS].”); *id.* at 1669–70 (Alito, J., concurring) (commenting that the Court's touch and concern “formulation obviously leaves much unanswered”); *id.* at 1673 (Breyer, J., concurring in the judgment) (“[The Court] offers only limited help in deciding the question presented . . . .  It leaves for another day the determination of just when the presumption against extraterritoriality might be ‘overcome.’”).

Indeed, the *Kiobel* majority did not explain its “touch and concern” language, nor did it define the operative terms pertinent to this inquiry, such as “sufficient force,” “relevant conduct,” or what more than “mere corporate presence” *would* suffice to permit jurisdiction.  *See id.* at 1669 (majority opinion). Thus, courts have been left to form their own interpretations as to the meaning and requirements of these standards.

### (3) Interpreting “Touch and Concern”

Pursuant to *Kiobel*, the presumption against extraterritoriality plainly bars jurisdiction over foreign-cubed actions brought under the ATS.  However, when an ATS claim involves a U.S.-citizen defendant or where events underlying the claim occur *both* domestically and extraterritorially, the courts must engage in further analysis.[12]  Four circuits including our own have addressed the effect of the

---

[12] All plaintiffs pursuing claims under the ATS will be foreign nationals; however, the citizenship or corporate status of the defendant and the location or impact of relevant conduct may provide key distinctions from *Kiobel*.  *See, e.g.*, *Al Shimari v. CACI Premier Tech., Inc.*,

presumption with regard to these types of claims, interpreting and applying the undefined "touch and concern" test from *Kiobel*. We consider some of the recent decisions from the Fourth, Second, and Ninth Circuits before turning to the Eleventh, as those decisions offer guidance in understanding our own precedent and in answering questions that our two decisions do not address.

### (a) Fourth Circuit

In an informative opinion considering ATS claims against a U.S. corporation based on the alleged torture of foreign nationals detained in Iraq, the Fourth Circuit interpreted *Kiobel*'s "touch and concern" language and found that the claims before it displaced the presumption against extraterritorial application. *See Al Shimari*, 758 F.3d at 520, 529.

The *Al Shimari* court first noted that the Court in *Kiobel* intentionally and "broadly stated that the 'claims,' rather than the alleged tortious conduct, must touch and concern United States territory with sufficient force." *Id.* at 527 (quoting *Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1669). Thus, the Court's operative language instructs lower courts to "apply a fact-based analysis" to determine whether ATS claims with a "close connection to United States territory" displace

---

758 F.3d 516, 527–28 (4th Cir. 2014) (distinguishing ATS claims from those barred by *Kiobel* due to the U.S. citizenship of the defendants and domestic conduct); *Mastafa*, 770 F.3d at 182 (describing *Kiobel* as "leav[ing] open a window for ATS actions that are based in part on extraterritorial conduct").

the presumption.  *Id.* at 527–28 ("[I]t is not sufficient merely to say that because the actual injuries were inflicted abroad, the *claims* do not touch and concern United States territory."); *see Black's Law Dictionary* 281 (9th ed. 2009) (a "claim" is the "aggregate of operative facts giving rise to a right enforceable by a court").  Under this interpretation, courts must "consider all the facts that give rise to ATS claims, including the parties' identities and their relationship to the causes of action." *Al Shimari*, 758 F.3d at 527.

Applying this fact-based analysis to the ATS claims before it, the Fourth Circuit found several factors relevant, including the defendant's status as a U.S. corporation; the U.S. citizenship of the defendant's employees that allegedly committed acts of torture; and the U.S. connections involved in the defendant corporation and its employees contracting with and obtaining security clearances from the U.S. government. *See id.* at 530–31.  The court also noted allegations that the defendant had aided and abetted acts of torture through conduct that took place within the United States; corporate managers located in the United States were aware of reports of misconduct and "implicitly, if not expressly, encouraged it." *Id.* at 531 (internal quotation marks omitted).  Finally, the court considered "the expressed intent of Congress, through enactment of the TVPA and 18 U.S.C. § 2340A, to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad." *Id.*

Weighing all of these factors, the *Al Shimari* court unanimously held that the plaintiffs' claims touched and concerned the territory of the United States with sufficient force to displace the presumption against extraterritorial application of the ATS. *See id.* at 530. Thus, the ATS conferred jurisdiction. *See id.* at 529.

### (b) Second Circuit

The Second Circuit offers a somewhat different approach to interpreting *Kiobel*'s touch and concern language. The court in *Mastafa* determined that "domestic contacts" are key: "An evaluation of the presumption's application to a particular case is essentially an inquiry into whether the domestic contacts are sufficient to avoid triggering the presumption at all." *Mastafa*, 770 F.3d at 182.

Looking to the complaint before it, the court found allegations of "some contact between the injuries alleged [that occurred extraterritorially] and the territory of the United States." *Id.* at 182–83 (internal quotation marks omitted). Thus, the presumption against extraterritoriality was triggered but not dispositive, and further jurisdictional inquiry was required. *See id.* at 183.

To determine the requisite inquiry as well as which facts were relevant, the Second Circuit turned to *Morrison*, 561 U.S. 247, 130 S. Ct. 2869, an earlier Supreme Court case applying the presumption against extraterritoriality to cases

arising under the Securities Exchange Act.[13]  In *Morrison*, the Court set forth the "focus" test, which requires courts to determine the "focus" of the statute it is considering; "the 'focus' of congressional concern" or the conduct "that the statute seeks to 'regulate'" must occur in the territory of the United States to rebut the presumption.[14]

Applying the focus test, the Second Circuit found that the focus of jurisdictional inquiries under the ATS is "on conduct and on the location of that conduct"; specifically, "the conduct alleged to violate the law of nations" or, as relevant to the case before the *Mastafa* court, the conduct "alleged to aid and abet the violation."  *Mastafa*, 770 F.3d at 185, 195.  To displace the presumption, then, there must be:

> (1) conduct of the defendant that "touche[s] and concern[s]" the United States with sufficient force to displace the presumption against extraterritoriality, *and* (2) that the *same conduct*, upon preliminary examination, states a claim for a violation of the law of nations or aiding and abetting another's violation of the law of nations.

*Id.* at 187.

---

[13] *See Morrison*, 561 U.S. at 255, 130 S. Ct. at 2877–78.  Although *Morrison* involved a substantive statute, whereas the ATS is jurisdictional, the Second Circuit found it could be "instructive and relevant" to the jurisdictional inquiry.  *See Mastafa*, 770 F.3d at 183 n.9.

[14] *See Morrison*, 561 U.S. at 266–67, 130 S. Ct. at 2884.  By way of example, in *Morrison*, the focus of the statute was "purchases and sales of securities."  *See id.* at 266, 130 S. Ct. at 2884.  Thus, that specific conduct had to take place in the United States.  When the purchase or sale of the security occurred abroad, the presumption against extraterritorial application prevented the exercise of jurisdiction.

Thus, the inquiry depended on "alleged conduct by *anyone*—U.S. citizen or not—that took place in the United States and aided and abetted a violation of the law of nations." *Id.* at 189. The court noted that the plaintiffs had "alleged specific, domestic conduct," including the defendants' purchasing and financing of oil transactions from within the United States and the facilitation of illegal payments and financing arrangements through a U.S.-based bank account. *Id.* at 195. Given these specific, non-conclusory allegations of domestic conduct, the *Mastafa* court found that the plaintiffs' claims appeared to touch and concern the United States with sufficient force to displace the presumption and satisfy the "first prong" of the court's jurisdictional analysis. *See id.*

However, although the domestic conduct displaced the presumption, the plaintiffs' claims failed the second prong of the court's jurisdictional inquiry; the plaintiffs failed to plausibly plead that the defendants' aiding and abetting of the international law violations met the required mens rea standard of the Second Circuit. *See id.* at 193–96 (allegations of the requisite mens rea standard were made only in "conclusory terms"). Consequently, the *Mastafa* court concluded it could not exercise jurisdiction over the plaintiffs' claims. *See id.* at 195–96.

### (c) Ninth Circuit

Two opinions from the Ninth Circuit are also instructive. In contrast to the Second Circuit, the Ninth Circuit determined that, although "*Morrison* may be

informative precedent," the *Morrison* focus test and the *Kiobel* touch and concern test involve distinct analyses. *See Doe v. Nestle USA, Inc.*, 766 F.3d 1013, 1028 (9th Cir. 2014) ("[S]ince the focus test turns on discerning Congress's intent when passing a statute, it cannot sensibly be applied to ATS claims, which are common law claims based on international legal norms.").[15] The *Nestle* court declined to apply and refine *Kiobel*'s "amorphous touch and concern test" given the limited record before it. *Id.* at 1028–29 (granting plaintiffs leave to amend their pleadings to allege that some of the activity underlying their ATS claim took place in the United States).

The Ninth Circuit then analyzed the touch and concern test in *Mujica v. AirScan Inc.*, 771 F.3d 580 (9th Cir. 2014). In *Mujica*, the plaintiffs contended that their claims displaced the presumption because the defendants were U.S. corporations and decisions furthering the conspiracy between the defendants and the perpetrators occurred in the United States. *See id.* at 591. However, the court noted that the only statement even alluding to any domestic conduct was found in the plaintiffs' reply brief, filed after *Kiobel*. *See id.* at 592. In that statement, the plaintiffs only "speculate[d] that some of [the] conduct . . . *could have* occurred in

---

[15] The *Nestle* court discussed several bases for its conclusion that "the opinion in *Kiobel* [] did not incorporate *Morrison*'s focus test," including that the *Kiobel* Court "chose to use the phrase 'touch and concern' rather than the term 'focus' when articulating the legal standard it did adopt" and that the concurring opinions indicated that the majority's "touch and concern" language set forth a *new* test. *See id.* at 1027–28.

the United States." *Id.* (emphasis added). Although *Kiobel* "did not hold that plaintiffs may *never* bring ATS claims based on extraterritorial conduct," the Ninth Circuit reasoned that permitting the plaintiffs' claims to proceed on a speculative assertion of domestic conduct would run counter to *Kiobel*'s requirement that claims must touch and concern with "sufficient force." *Id.* at 591–92.

The court also determined that, given the absence of any non-speculative allegations of domestic conduct, the defendants' U.S. citizenship alone was insufficient to displace the presumption. *See id.* at 594. In so holding, the court was careful to note that citizenship may be "one factor that, in conjunction with other factors, can establish a sufficient connection between an ATS claim and the territory of the United States to satisfy *Kiobel*." *Id.* at 594 & n.9 ("We do not contend that this factor is irrelevant to the *Kiobel* inquiry; we merely hold that it is not dispositive of that inquiry."). The *Mujica* court thus concluded that the plaintiffs' claims did not displace the presumption. *See id.* at 596.

### (d) Eleventh Circuit

Having considered some of the approaches to interpreting and applying *Kiobel*'s operative language, we turn now to the two opinions of this circuit that address ATS claims after *Kiobel*.[16]

---

[16] Prior to *Kiobel*, we did not apply the presumption against extraterritoriality to claims brought under the ATS. Thus, our pre-*Kiobel* case law considering the ATS has little relevance to our interpretation of the presumption here.

22

In *Cardona*, the plaintiffs claimed that a U.S. company, from within the United States, made decisions to collaborate with and fund the paramilitary organizations that committed extrajudicial killings and war crimes in Colombia. 760 F.3d at 1194 (Martin, J., dissenting).[17]  Although the *Cardona* majority quoted *Kiobel*'s touch and concern language, it stopped short of fully interpreting the test, instead noting that the case in *Kiobel* was "in some ways parallel" to the one before the court in *Cardona*.  *See id.* at 1189, 1191 (majority opinion).

Thus, without further analysis, *Cardona* found that, like *Kiobel*, "[a]ll the relevant conduct in [this] case took place outside the United States," and the plaintiffs could not "anchor ATS jurisdiction in the nature of the defendants as United States corporations" to make the statute apply extraterritorially.  *See id.* at 1189.  Noting the absence of an "allegation that any torture occurred on U.S. territory, or that any other act constituting a tort in terms of the ATS touched or concerned the territory of the United States with any force," the court in *Cardona* concluded it did not have jurisdiction because "[t]here is no other statute" and "the ATS does not apply extraterritorially."  *See id.* at 1189–91.

The remainder of the majority opinion is couched as responding to the dissent, but it primarily discusses whether torture is cognizable under the ATS,

_____

[17] We deduce this from the dissenting opinion, as the *Cardona* majority did not discuss the allegations in the complaint or the plaintiffs' claims with any specificity and made no mention of these particular allegations.

implying that jurisdiction may be limited by the plaintiffs' cause of action.  *See id.* at 1190 ("It is not nearly so clear, as our dissenting colleague believes, that acts described as 'torture' come within the jurisdiction created by the statute . . . .").  The majority insinuated that torture may not be recognized as a tort in violation of the law of nations, referring to such a finding as one that would "create a cause of action within the ATS jurisdiction against the caution of *Sosa*" and would "expand" ATS jurisdiction.[18]  *See id.* at 1191, 1192.

Dissenting from the majority opinion, Judge Martin considered the plaintiffs' allegations that the defendant "violated international law from within the United States by offering substantial assistance to a campaign of violence abroad." *Id.* at 1195 (Martin, J., dissenting).  Plaintiffs' claims, then, were not for conduct or "actions that took place on foreign soil," but rather for the defendants' *domestic* conduct, which included "reviewing, approving, and concealing a scheme of payments and weapons shipments to Colombian terrorist organizations, all from their corporate offices in the territory of the United States."  *Id.* at 1192, 1194–95.  Given that the "plaintiffs s[ought] relief in a United States court for violations of

---

[18] The majority opinion did not acknowledge that this circuit already recognizes—in cases after *Sosa*—that both torture and extrajudicial killing are cognizable violations of the law of nations under the ATS.  *See, e.g.*, *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1265–66 & n.15 (11th Cir. 2009), *abrogated in part on other grounds by Mohamad*, 566 U.S. ___, 132 S. Ct. 1702; *Romero*, 552 F.3d at 1316; *Aldana*, 416 F.3d at 1247.  The dissent remarked on the majority's observation, noting only that it did not "read the majority opinion as casting doubt on this Court's post-*Sosa* jurisprudence holding that torture is a proper claim that may be brought under the ATS."  *Cardona*, 760 F.3d at 1193 n.3 (Martin, J., dissenting).

24

international law committed by United States citizens while on United States soil," the dissent would have found that the "claims touch[ed] and concern[ed] the territory of the United States with great force," sufficient to displace the presumption. *Id.* at 1195 (internal quotation marks omitted).

The majority opinion in *Cardona* offers only limited guidance as to the interpretation of *Kiobel* and the application of the presumption against extraterritoriality. However, since the court held that the ATS did not confer jurisdiction, the majority must have concluded that the plaintiffs' allegations in the case before it did not touch and concern the territory of the United States with sufficient force to displace the presumption.

Another panel of this court considered the impact of *Kiobel* in *Baloco II*, 767 F.3d 1229. The claims of the plaintiffs in *Baloco II* and those of Plaintiffs before us now are premised on similar allegations—that the defendants made decisions within the United States to fund, aid and abet, and otherwise support the perpetrators of extrajudicial killings in Colombia.[19] *See id.* at 1233. As with *Cardona*, the opinion in *Baloco II* quoted the touch and concern test from *Kiobel*, but *Baloco II* also offered an interpretation of *Kiobel*'s operative language. In so

_____

[19] In *Baloco II*, the defendants are the same as in this case (Drummond Company, Drummond Ltd., Jimenez, and Tracy). The *Baloco II* plaintiffs are relatives of union leaders at Drummond Company's coalmine who were killed by the AUC, whereas Plaintiffs in the present case are relatives and representatives of additional individuals killed by the AUC around Drummond Company's mining operations and rail line.

doing, *Baloco II* looked to the guidance in *Morrison*, 561 U.S. 247, 130 S. Ct. 2869, including the focus test therein, and ultimately set forth its own fact-based approach incorporating both the touch and concern test and the focus test.  *See Baloco II*, 767 F.3d at 1236–37.

*Baloco II*'s dispositive analysis amalgamates *Kiobel*'s standards with *Morrison*'s focus test, considering whether "the claim" and "relevant conduct" are sufficiently "focused" in the United States to warrant displacement and permit jurisdiction.[20]  *See id.* at 1238–39.  Thus, *Baloco II* interpreted *Kiobel*'s touch and concern test to require some relevant conduct to occur in the United States; if *all* relevant conduct occurs entirely outside of the United States, the claim will be barred and no further jurisdictional inquiry will be required.[21]

Applying these standards, the *Baloco II* panel determined that, if the "'relevant conduct' inquiry extend[ed] to the place of decision-making—as

---

[20] To be clear, the *Morrison* focus test refers to the focus of the *statute* (that is, the conduct regulated therein or purposes thereof), not the focus of the claim or that of the conduct.

[21] In this way, *Baloco II*'s instruction comports with *Kiobel* and *Morrison*.  The rule from *Kiobel* is not "claims are barred where relevant conduct occurred abroad," but rather "claims are barred where *all* relevant conduct occurred abroad."  *See Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1669; *see also Daimler AG*, 571 U.S. at ___, 134 S. Ct. at 750, 763 (*Kiobel* foreclosed "the authority of a court in the United States to entertain a claim brought by foreign plaintiffs against a foreign defendant based on events occurring *entirely* outside the United States." (emphasis added)).  Comparably, in *Morrison*, the conduct that must take place in the United States to rebut the presumption is the conduct that "was the focus of congressional concern."  *See Mastafa*, 770 F.3d at 185, 195.  While *Baloco II* did not determine *what* relevant conduct is the "focus" of the jurisdictional inquiry under the ATS when it incorporated *Morrison*'s focus test, the Second Circuit found that the focus for ATS purposes is on "the conduct alleged to violate the law of nations" or the conduct "alleged to aid and abet the violation."  *See id.*

opposed to the site of the actual 'extrajudicial killing,'" the plaintiffs would need to allege a "minimum factual predicate warranting the extraterritorial application of the ATS." *Id.* at 1236. There must be some conduct in the United States that is either "directed at" the underlying violation (the extrajudicial killing) or that indicates "an express quid pro quo understanding" that the defendants would aid and abet the perpetrators in exchange for the law of nations violation. *See id.* Further, the relevant conduct must be alleged "to a degree necessary to overcome the presumption." *Id.* at 1239. Absent the sufficient factual predicate, the presumption will not be overcome and the claims will be dismissed.

This factual predicate was not met in *Baloco II*; the plaintiffs' allegations of the defendants' "mere consent" from within the United States to support a terrorist organization did not suffice. *See id.* at 1236. Nor were there allegations of "a purported express agreement" between the defendants and the perpetrators to commit the underlying law of nations violations on the defendants' behalf. *Id.* (finding no allegations that the defendants "would finance AUC operations in exchange for the AUC carrying out the killings"). The court determined that the underlying conduct (the extrajudicial killings) *might* have "'touch[ed] and concern[ed] the territory of the United States' (because of [the defendants'] alleged involvement)." *See id.* at 1238. However, the court's "consideration of all facts"

27

led it to conclude that the plaintiffs' claims did not do so with sufficient force to displace the presumption against extraterritorial application. *See id.*

*Baloco II* thus makes clear that the presumption against extraterritoriality may be displaced or overcome to permit jurisdiction.[22] *See id.* at 1236–38. Addressing whether displacement was warranted, the court considered the facts of the case before it and whether a minimum factual predicate had been met with regard to the alleged aiding and abetting conduct within the United States. *See id.* Based on those facts and after weighing the same, the court in *Baloco II* concluded that displacement was not warranted, and the presumption against extraterritoriality precluded jurisdiction. *See id.* at 1237 (noting that, "when a claim brought under the ATS for violation of the law of nations fails to overcome the presumption," the exercise of jurisdiction is improper); *id.* at 1238 (determining that the facts in the case before it "weigh[ed] against a finding that [p]laintiffs' claims touch and concern the territory of the United States with sufficient force to

_____

[22] Reading our precedent in tandem and noting that *Baloco II* cited *Cardona* in its conclusion, we construe *Cardona*'s assertion that "the ATS does not apply extraterritorially" to mean that the presumption against extraterritorial application was not sufficiently displaced in *that* case. *See Cardona*, 760 F.3d at 1191 (acknowledging "the possibility of an exception to the presumption against extraterritoriality"). We cannot read *Cardona*'s statement as a broad rule that *all* ATS claims involving some extraterritorial aspects are barred; to do so would render moot the statements by the Supreme Court as well as this court regarding "relevant conduct" and displacement. *See Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1669; *Baloco II*, 767 F.3d at 1237–38; *see also Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1665–69 (referring to "overcoming," "rebutting," or "displacing" the presumption); *id.* at 1673 (Breyer, J., concurring in the judgment) (noting that the majority opinion "makes clear that a statutory claim might sometimes touch and concern the territory of the United States with sufficient force to displace the presumption" (internal quotation marks and alteration omitted)). Thus, we find that *Cardona*, in accord with *Kiobel* and *Baloco II*, holds that the ATS does not apply extraterritorially when it has not been displaced.

displace the presumption"). The court summarized its holding and reasons therefor with the following: "[p]laintiffs' *claims* [we]re not focused within the United States." *See id.* at 1238 (emphasis added).

## B. Legal Framework

In this crowded legal landscape, we must determine what framework applies to ATS claims when aspects of the claims occur both domestically and extraterritorially.[23] Our precedent directs this navigation, while persuasive authority from the other courts guides us when our previous decisions do not provide clear directions. We find that actions under the ATS with an extraterritorial component must touch and concern the territory of the United States with sufficient force to displace the presumption in order for jurisdiction to be proper. Displacement of the presumption will be warranted if the claims have a U.S. focus and adequate relevant conduct occurs within the United States.

Turning to how we apply this standard, we look to the ATS claims as alleged in order to determine whether the action is focused in the United States, in addition to what aspects of the claims and conduct are relevant to our inquiry. This is a fact-intensive inquiry, requiring us to look closely at the allegations and evidence

---

[23] To reiterate, pursuant to *Kiobel* and our prior interpretations thereof, if *no* relevant aspects of an ATS claim occur within the United States, the presumption against extraterritoriality prevents jurisdiction; however, if *some* relevant aspects of the claim occur within the United States, we must determine whether the presumption is displaced. In a third scenario wherein *all* relevant aspects occur within the United States, the presumption against extraterritoriality would obviously not apply—there would be no extraterritorial component to the claim.

in the case before us.  *See Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1669 (noting that "on these facts, all the relevant conduct took place outside the United States"); *Baloco II*, 767 F.3d at 1235–36, 1238 (considering whether the plaintiffs' ATS claims could "proceed under the facts of this case" and holding based on "consideration of all facts"); *accord Al Shimari*, 758 F.3d at 527.

In weighing the pertinent facts, the site of the conduct alleged is relevant and carries significant weight.  Accordingly, our jurisdictional inquiry requires us to consider the domestic or extraterritorial location where the defendant is alleged to engage in conduct that directly or secondarily results in violations of international law within the meaning of the ATS.  *See Mastafa*, 770 F.3d at 185, 195; *see also Cabello*, 402 F.3d at 1157–58 (noting that "where a defendant has been found directly or secondarily responsible for acts of torture or extrajudicial killing, the acts are in violation of the law of nations within the meaning of the . . . [ATS]").  When the claim is for secondary responsibility, we must also consider the location of any underlying conduct, such as where the actual injuries were inflicted.[24]  *See Baloco II*, 767 F.3d at 1236, 1238–39; *Cardona*, 760 F.3d at 1189, 1191.

---

[24] This factor is weighty but not dispositive to our jurisdictional determination.  Although the other factors were *insufficient* to warrant displacement of the presumption against extraterritoriality in our earlier decisions, we decline to construe our precedent as finding that facts other than the extraterritorial or domestic location of the underlying conduct are *irrelevant*.  Not only would such a construction diverge from the other circuit courts to consider this question, but also it would be an illogical reading for the presumption generally and the ATS specifically.

Further, the domestic conduct alleged must meet a "minimum factual predicate" to warrant the extraterritorial application of the ATS. *See Baloco II*, 767 F.3d at 1236; *accord Mujica*, 771 F.3d at 592. Thus, we must consider whether the claims are focused within the United States *and* to what extent—that is, whether the plaintiffs have proffered allegations and evidence to the "degree necessary" to warrant displacing the presumption. *See Baloco II*, 767 F.3d at 1239.

## C. Discussion

We must now ascertain whether the above requirements were met by Plaintiffs' claims on appeal. Under *Kiobel*, the inquiry is whether a federal court has jurisdiction to consider claims brought under the ATS. The district court below interpreted *Kiobel* to foreclose Plaintiffs' remaining ATS claims and thus

---

For instance, if the defendant and the plaintiff are both foreign nationals and all of the harmful effects of the conduct impact a foreign country, and only limited conduct underlying the claim occurred domestically, we would not assume that the ATS automatically confers jurisdiction, permitting us to hale the foreign defendant into U.S. courts and hold the defendant *civilly* liable for all damages, including those on foreign soil. To do so could result in the type of impermissible interference with foreign sovereigns that the presumption against extraterritoriality prohibits. Such a construction would also prevent jurisdiction even if a U.S. defendant performed key conduct within the United States (e.g., assembling explosive devices) and then provided those weapons to a terrorist organization for use within another country with catastrophic consequences. Thus, it would reach too far to find that the only *relevant* factor is where the conduct occurred, particularly the underlying conduct. *See, e.g.*, *Al Shimari*, 758 F.3d at 528 ("[I]t is not sufficient merely to say that because the actual injuries were inflicted abroad, the *claims* do not touch and concern United States territory"; rather, "a more nuanced analysis is required to determine whether the presumption has been displaced.").

31

dismissed the claims on summary judgment.[25]  We review de novo questions of subject matter jurisdiction and grants of summary judgment.  *See Romero*, 552 F.3d at 1313.

Here, Plaintiffs brought suit under the ATS, claiming that Defendants, from within the United States, aided and abetted and conspired with the AUC to carry out extrajudicial killings and war crimes in Colombia.  Since Plaintiffs' claims as alleged involve both domestic and extraterritorial conduct, the presumption against extraterritoriality applies and will prevent jurisdiction unless it is displaced.  Thus, we must address whether Plaintiffs' claims touch and concern the territory of the United States and are focused therein.  Even if their claims touch and concern the United States, that alone will be insufficient to permit jurisdiction.  We must then determine whether Plaintiffs' claims do so to the degree necessary; that is, whether the claims act with sufficient force to displace the presumption.

Plaintiffs aver that there are three distinct ways in which their claims are focused within and touch and concern the United States with sufficient force to displace the presumption: (1) Defendants here, unlike the *Kiobel* defendants, are U.S. corporations and citizens; (2) there are strong U.S. interests because Defendants provided material support to a U.S.-designated terrorist organization;

---

[25] Defendants' summary judgment motions were pending before the district court when the Supreme Court issued its opinion in *Kiobel*, and the district court rendered its decisions granting summary judgment after considering supplemental briefing from the parties on *Kiobel*.

and (3) key conduct occurred in the United States, including Defendants' decisions to conspire with and aid and abet the AUC's commission of extrajudicial killings and war crimes and agreement to fund the AUC. We address each in turn.

### (1)  U.S. Citizenship

Plaintiffs argue that their case is distinct from *Kiobel* because Drummond Company and Drummond Ltd. are American corporations and Tracy is a U.S. citizen.  Further, the corporate entities here maintain more than "mere corporate presence" in the territory of the United States; they also are incorporated in a state within the territory of the United States and their principal place of business is located within the United States.  *Cf. Kiobel*, 569 U.S. at ___, 133 S. Ct. 1669 (noting that "mere corporate presence" does not displace the presumption).

We must first address whether this factor is relevant to our jurisdictional inquiry.[26]  The Supreme Court did not exclude the significance of U.S. citizenship, as *Kiobel* did not concern U.S. citizens nor did the opinion directly address the

---

[26] The other circuits to consider this question have varied.  The Fourth and the Ninth Circuits consider U.S. citizenship relevant to, if not dispositive of, the jurisdictional determination; the Second Circuit finds it irrelevant.  *Compare Al Shimari*, 758 F.3d at 530 (concluding that the presumption against extraterritorial application was displaced in part because of the defendant corporate entity's status as a U.S. corporation and the U.S. citizenship of the defendant employees); *Mujica*, 771 F.3d at 594 (opining that "a defendant's U.S. citizenship or corporate status" may be relevant in conjunction with other factors toward establishing a sufficient connection between an ATS claim and the territory of the United States); *with Mastafa*, 770 F.3d at 189 (disagreeing "with the contention that a defendant's U.S. citizenship has any relevance to the jurisdictional analysis," because the crucial inquiry is whether "alleged conduct by *anyone*—U.S. citizen or not— . . . took place in the United States and aided and abetted a violation of the law of nations").

same.  Instead, *Kiobel* implicitly supports that citizenship or corporate status may be relevant to whether a claim touches and concerns the territory of the United States, given that, after it set forth the test, it determined that "mere corporate presence" was insufficient.[27]  *See id.*

Further, while the defendants' U.S. citizenship was not dispositive in either of our post-*Kiobel* cases, we have not ruled out consideration of this factor altogether.  In *Baloco II*, the court factored into its analysis the nationality of the defendants, noting that the case before it was factually distinct from *Kiobel* since "*Kiobel* did not involve a corporate national of the United States or *any* conduct of the defendants within the United States."  *See Baloco II*, 767 F.3d at 1236–37.

*Baloco II* determined, however, that a defendant's U.S. citizenship is not sufficient to displace the presumption, as this factor alone does not carry the "significant weight" necessary to "warrant the extraterritorial application of the ATS to situations in which the alleged relevant conduct occurred abroad."  *See id.*

---

[27] Interestingly, to the extent the term "touch and concern" has been used in the jurisdictional context before, it relates to a distinction in the analysis of issues concerning *personal* jurisdiction.  In the personal jurisdiction setting, the term is used to note the difference between "(1) general, 'all purpose' adjudicatory authority to entertain a suit against a defendant without regard to the claim's relationship vel non to the defendant's forum-linked activity, and (2) specific jurisdiction to entertain controversies based on acts of a defendant that *touch and concern* the forum."  *Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 928 (D.C. Cir. 1981) (emphasis added).  The latter category "encompass[es] claims arising from forum-linked acts or consequences."  *Id.* at 929.  Given that subject matter jurisdiction is a distinct inquiry, we do not place significant emphasis on this point other than to note that the touch and concern language used by the Supreme Court in applying the presumption against extraterritoriality to a jurisdictional statute for the first time may have some parallels in a different jurisdictional doctrine.

34

at 1236 & n.6 (noting without holding that "the Second Circuit has held that the rule of law applied in *Kiobel* does not *turn on* a defendant's citizenship" (emphasis added)).  Similarly, while *Cardona* held that plaintiffs could not simply "anchor ATS jurisdiction in the nature of the defendants as United States corporations," it did not jettison this factor's usefulness entirely.  *See Cardona*, 760 F.3d at 1189.  We find that the citizenship or corporate status of the defendants can guide us in our navigation of the touch and concern inquiry even though it does not firmly secure our jurisdiction.

Thus, in determining whether a claim sufficiently touches and concerns the territory of the United States to confer jurisdiction to U.S. courts, the citizenship or corporate status of the defendant is relevant.  If the defendants are U.S. citizens, some of the foreign policy concerns that the presumption against extraterritorial application is intended to reduce may be assuaged or inapplicable, since we would not be haling foreign nationals into U.S. courts to defend themselves.[28] Additionally, the acts of U.S. citizens may impact the United States, whether their

---

[28] *See Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1669 (noting that the presumption "guards against our courts triggering [the] serious foreign policy consequences" that could be raised if "other nations, also applying the law of nations, could hale our citizens into their courts for alleged violations of the law of nations occurring in the United States, or anywhere else in the world"); *Al Shimari*, 758 F.3d at 530 (concluding that the case did "not present any potential problems associated with bringing foreign nationals into United States courts to answer for conduct committed abroad, given that the defendants are United States citizens"); *accord Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 322–24 (D. Mass. 2013) (holding that *Kiobel* did not bar ATS claims against an American citizen, in part because "[t]his is not a case where a foreign national is being hailed [sic] into an unfamiliar court to defend himself").

actions occur extraterritorially or within the United States, particularly if those actions include international law violations. *See, e.g.*, *Al Shimari*, 758 F.3d at 530–31 (considering "the expressed intent of Congress . . . to provide aliens access to United States courts and to hold citizens of the United States accountable for acts of torture committed abroad"); *cf. F. Hoffmann–La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 159, 165, 124 S. Ct. 2359, 2363, 2367 (2004) (noting that Congress may impose liability for extraterritorial conduct that has adverse effects within the United States and may do so with even "greater leeway when it seeks to control . . . the actions of *American* companies").[29]

Here, Plaintiffs' claims potentially touch and concern the territory of the United States; they are brought against U.S. citizens and entities that reside in and conduct business within the United States, and Plaintiffs allege that those same U.S. citizens aided and abetted extrajudicial killings and war crimes in violation of the law of nations. Although the U.S. citizenship of Defendants is relevant to our inquiry, this factor is insufficient to permit jurisdiction on its own. *See Baloco II*, 767 F.3d at 1236; *accord Mujica*, 771 F.3d at 594 & n.9 (contending that U.S. citizenship or corporate status alone is not dispositive); *see also Al Shimari*, 758 F.3d at 530–31 (considering the defendants' U.S. citizenship in addition to other

---

[29] For further discussion of authorities supporting the relevance of U.S. citizenship in a jurisdictional inquiry, specifically with regard to extraterritorial ATS claims against U.S. citizens, see Doug Cassel, *Suing Americans for Human Rights Torts Overseas: The Supreme Court Leaves the Door Open*, 89 Notre Dame L. Rev. 1773 (2014).

36

factors).  Thus, we must consider it in conjunction with any other relevant factors; further analysis is required.

**(2) U.S. Interests**

Plaintiffs also contend that important U.S. interests are triggered by the nature of Defendants' conduct: funding a U.S.-designated terrorist organization. Claims involving U.S. entities and persons funding a U.S.-designated terrorist organization may have a U.S. focus, as required by our precedent and distinct from the claims brought in *Kiobel*.[30]  Thus, this factor is relevant.

Here, the U.S. government designated the AUC as a "Foreign Terrorist Organization" (FTO) in 2001, which means it considered the AUC an organization engaging in terrorist activity that threatens the national security of the United States.  *See* 8 U.S.C. § 1189(a)(1).  This designation barred any U.S. person or entity from knowingly providing material support or resources to the AUC, or attempting or conspiring to do so.  *See* 18 U.S.C. § 2339B.  Plaintiffs allege that Defendants continued to make payments to the AUC after the AUC was designated as an FTO, even though Defendants knew of its FTO designation.  Plaintiffs thus aver that their claims have a key U.S. component, since Defendants' purported

---

[30] *See, e.g.*, *Mwani v. Laden*, 947 F. Supp. 2d 1, 5 (D.D.C. 2013) (finding that the presumption had been displaced because the underlying events—an attack on the United States Embassy in a foreign country—were "tied much more closely to our national interests" than the mere corporate presence connection in *Kiobel*, particularly given the "[a]mple evidence" that the events "were directed at the United States government, with the intention of harming this country and its citizens").

37

support of the AUC has been recognized by the U.S. government as counter to U.S. interests.

Turning to whether this factor is sufficient to permit jurisdiction as alleged here, we look no further than our precedent.  Allegations of U.S. entities supporting terrorist organizations were before this court in both *Baloco II* and *Cardona*.  In *Cardona*, the plaintiffs alleged that the defendants "participated in a campaign of torture and murder in Colombia by reviewing, approving, and concealing a scheme of payments and weapons shipments to Colombian terrorist organizations, all from their corporate offices in the territory of the United States." *See* 760 F.3d at 1192 (Martin, J., dissenting).  The majority must not have considered this factor dispositive, given that it made no reference to this allegation in holding that the presumption was not displaced.  It is not clear, however, whether or to what extent the majority considered any "terrorist organization" designation *by the U.S. government* of the Colombian groups receiving support from the U.S.-based defendants.

In *Baloco II*, the plaintiffs proffered nearly the same allegations and arguments with regard to this factor as did Plaintiffs in this case.[31]  While we did not explicitly discuss the AUC's designation by the United States as a terrorist

---

[31] The court ordered the parties in *Baloco II* to brief the impact of *Kiobel* on the case.  In response, the plaintiffs there similarly argued that the defendants' conduct involving payments to the AUC, a designated terrorist organization, violated U.S. national security interests.  *See* Plaintiffs-Appellants' Response Letter Brief at 6–7, *Baloco II*, 767 F.3d 1229 (No. 12-15268).

organization, we determined the plaintiffs' general allegations of agreement with and support of the AUC did not warrant displacement.  *See Baloco II*, 767 F.3d at 1233, 1236, 1238–39.  After having considered the argument that the defendants' payments to a U.S.-designated terrorist organization violated U.S. interests, *Baloco II* still found that the plaintiffs' claims were not sufficient to confer jurisdiction.  *See id.* at 1238–39.

Thus, although the U.S. interests implicated by Defendants' alleged support of a U.S.-designated terrorist organization constitute a relevant factor, we must conclude that, on the facts before us, this factor also does not strike with "sufficient force" to displace the presumption and permit jurisdiction.  *See id.* at 1236.

**(3) U.S. Conduct**

Plaintiffs have also alleged that U.S.-based conduct distinguishes their claims from those of the plaintiffs in *Kiobel*.  In *Kiobel*, all relevant conduct occurred outside the United States, and the Court limited its holding to those facts.  *See* 569 U.S. at ___, 133 S. Ct. at 1669.  Plaintiffs' case, as with the cases before the court in *Cardona* and *Baloco II*, requires us to determine whether the presumption is displaced when *some* relevant conduct occurs domestically.  This inquiry is key.  While the previous factors are relevant to determining whether the claims touch and concern the United States and have a U.S. focus, our precedent indicates that the sufficiency question—whether the claims do so with "sufficient

39

force" or to the "degree necessary" to warrant displacement—will only be answered in the affirmative if *enough* relevant conduct occurred within the United States.

In *Baloco II*, we "[a]ssum[ed], without deciding, that the 'relevant conduct' inquiry extends to the place of decision-making—as opposed to the site of the actual 'extrajudicial killing.'"  767 F.3d at 1236.  We hold now, in accord with the other circuit courts of appeals to consider this question, that the jurisdictional inquiry requires looking to the plaintiffs' specific claim to determine what contacts with or connections to the United States are relevant; thus, the inquiry may indeed extend to the place of decision-making.  *See Mastafa*, 770 F.3d at 182–83, 185, 195 (allegations of conduct such as purchasing and financing from within the United States were relevant to whether the aiding and abetting claim touched and concerned the territory of the United States); *Al Shimari*, 758 F.3d at 530–31 (allegations that defendants approved, encouraged, and then attempted to cover up the extraterritorial misconduct from within the United States were relevant to whether plaintiffs' claims touched and concerned the United States); *Mujica*, 771 F.3d at 590–91 (allegations that decisions furthering the conspiracy between defendants and perpetrators occurred in the United States were relevant to the jurisdictional inquiry although too conclusory to be sufficient).

Our precedent makes clear that claims based on aiding and abetting and conspiracy liability are cognizable under the ATS. *See, e.g.*, *Romero*, 552 F.3d at 1315; *Aldana*, 416 F.3d at 1248; *Cabello*, 402 F.3d at 1157. Thus, when considering claims that the defendants aided and abetted or conspired with the perpetrators who committed the underlying violation, the domestic or extraterritorial location of all conduct in support of those claims is relevant to the jurisdictional inquiry. *See Mastafa*, 770 F.3d at 182–83, 187; *Al Shimari*, 758 F.3d at 528–29. And our recent decisions dictate that the claims will only *displace* the presumption against extraterritoriality if enough of the relevant conduct occurs domestically and if the allegations of domestic conduct are supported by a minimum factual predicate. *See Baloco II*, 767 F.3d at 1238–39.

Here, Plaintiffs' ATS claims are that Defendants aided and abetted and conspired with the AUC from within the United States, resulting in war crimes and the extrajudicial killing of Plaintiffs' decedents in Colombia. The extraterritorial location of the deaths of Plaintiffs' family members is relevant to Plaintiffs' claims that the killing of their decedents by the AUC constituted extrajudicial killings or war crimes. However, Plaintiffs also allege relevant domestic conduct on the part of Defendants, as they allege Defendants' actions from within the United States— such as making decisions to engage with the AUC and agreeing to fund the AUC—aided and abetted the AUC. We must now determine whether these claims

41

involve enough domestic conduct to touch and concern the United States to the degree necessary to displace the presumption.

In *Cardona* and *Baloco II*, the plaintiffs proffered similar domestic conduct. Those opinions concluded, either implicitly or explicitly, that general allegations involving U.S. defendants' domestic decision-making with regard to supporting and funding terrorist organizations were insufficient to warrant displacement and permit jurisdiction. *See Cardona*, 760 F.3d at 1194–95 (Martin, J., dissenting) (describing the factual allegations underlying the plaintiffs' claims, implicitly rejected by the majority); *see also Baloco II*, 767 F.3d at 1238–39 ("Assuming arguendo that Drummond was complicit in these murders in the manner described by [p]laintiffs . . . , the allegations and evidence still do not show conduct focused in the United States.").

We must similarly find that Plaintiffs' claims do not allege sufficient domestic conduct to displace the presumption. Plaintiffs allege that generally, Defendants made funding and policy decisions in the United States; but Plaintiffs specifically allege that the agreements between Defendants and the perpetrators of the killings, the planning and execution of the extrajudicial killings and war crimes, the collaboration by Defendants' employees with the AUC, and the actual funding of the AUC all took place in Colombia. In light of our precedent, the domestic location of the decision-making alleged in general terms here does not

outweigh the extraterritorial location of the rest of Plaintiffs' claims.  *See Baloco II*, 767 F.3d at 1238–39; *Cardona*, 760 F.3d at 1189–91.

Further, Plaintiffs' allegations of domestic conduct and connections are not particularly extensive or specific.  *See, e.g.*, *Mastafa*, 770 F.3d at 195 (requiring allegations of "specific, domestic conduct"); *accord Mujica*, 771 F.3d at 592.  This paucity is apparent when we consider the allegations before the two circuit courts that *have* found that the ATS claims met the touch and concern test.  For example, the plaintiffs before the Fourth Circuit alleged extensive, explicit connections to and conduct within the United States.  There, the defendants made pertinent contracts and obtained necessary security clearances from the U.S. government in the United States; further, the plaintiffs alleged that the defendants approved and attempted to cover up the specific extraterritorial violations at issue from within the United States.  *See Al Shimari*, 758 F.3d at 530–31.

Comparably, the Second Circuit found that the claims before it touched and concerned the United States after considering specific allegations of defendants' domestic purchases, delivery, and financing arrangements in the United States, as well as defendants' facilitation of illegal payments through a U.S.-based bank account to support the extraterritorial violations at issue in that case.  *See Mastafa*, 770 F.3d at 195.  Likewise, district courts exercising jurisdiction after *Kiobel* have

considered allegations that are more specific or noted further supporting evidence of domestic conduct and connections than presented by Plaintiffs' claims here.[32]

Most importantly, Plaintiffs have not presented any evidence of additional domestic conduct that would meet *Baloco II*'s requirements. The circumstances underlying the ATS claims in this case—including the Defendants, paramilitary perpetrators, general factual background, and allegations of Defendants' involvement—are nearly identical to those in *Baloco II*, even though these Plaintiffs have had the added benefit of discovery. Plaintiffs here continue to allege that an employee obtained consent within the United States to provide substantial financial and material support to the AUC. These are the same allegations and evidence we explicitly considered and rejected in *Baloco II*.

In that case, the plaintiffs alleged in their complaint that the employee, Jim Adkins, "obtained consent in Alabama from Garry Drummond [Drummond Company's President] and other Drummond officials to provide substantial support to the AUC." *Baloco II*, 767 F.3d at 1236 (internal quotation marks omitted). The court then considered the evidence in support of this assertion, which was derived

---

[32] *See, e.g.*, *Krishanti v. Rajaratnam*, No. 2:09-CV-05395 JLL, 2014 WL 1669873, at *10 (D.N.J. Apr. 28, 2014) (unpublished) (plaintiffs alleged that defendants hosted meetings with operatives of and speakers for a designated terrorist organization and transferred funds within the United States); *Sexual Minorities Uganda*, 960 F. Supp. 2d at 321 (plaintiffs alleged defendant communicated about "legislation proposing the death penalty" for the targeted group and "reviewed a draft of the legislation and provided advice on its content" from within the United States); *Mwani*, 947 F. Supp. 2d at 5 (plaintiffs presented sufficient evidence that overt acts in furtherance of the defendants' conspiracy to attack the United States by bombing a U.S. embassy occurred in the United States).

from the discovery in *this* case. *See id.* at 1236, 1238 (noting that "[t]hese materials were obtained from discovery in a related case" and citing to the proceedings below). Specifically, *Baloco II* noted witness depositions and declarations stating, "Adkins frequently traveled to the United States"; "Adkins told [the witness] he would bring up the issue of collaboration with the AUC with Garry Drummond"; "subsequently, Drummond agreed to fund the AUC"; and "the murders . . . were 'agreed to' by Garry Drummond." *Id.* at 1238.

*Baloco II* held that, regardless of the veracity of the above allegations and admissibility of the evidence, this was "not enough . . . to establish that, assuming [p]laintiffs' claims 'touch and concern the territory of the United States,' they do so with sufficient force to displace the presumption against extraterritorial application." *See id.* at 1238. Here, there are no distinguishable allegations or evidence of conduct in the United States "directed at" the extrajudicial killings and war crimes, and "mere consent" is not enough.[33] *See id.* at 1236, 1238–39. Consequently, in this closely connected case, we must find that Plaintiffs'

---

[33] For this reason, one of Plaintiffs' ancillary arguments—that the district court below erroneously excluded evidence of U.S.-based conduct in making its jurisdictional decision— must fail. The district court refused to consider much of the testimony of Plaintiffs' key witnesses, Jairo Charris Castro and Jaime Blanco Maya, specifically as it pertained to statements and actions attributed to Adkins. The district court's exclusion of this evidence in the case below is irrelevant given that, in *Baloco II*, we considered this same evidence, explicitly addressing these witnesses' testimony, and found that even "assuming it is true and that it is admissible, [it] is not enough" to permit jurisdiction. *See* 767 F.3d at 1238 (considering "Blanco's 2012 deposition and 2012 declaration, as well as quotes from the 2012 deposition of Jairo Charris Castro"). Simply put, Plaintiffs have pointed us to no evidence of U.S. conduct—admissible or otherwise—that is additional to or distinguishable from the evidence considered and rejected by this court in *Baloco II*.

allegations regarding Defendants' domestic conduct do not meet the requisite factual predicate or act with the forcefulness envisioned by *Baloco II* to warrant displacement. *See id.* at 1238–39.

Although our two prior decisions may not clearly address the scope and interpretation of *Kiobel*'s touch and concern test, we cannot say the same for their conclusions: plainly, the presumption against extraterritoriality was not displaced. In the absence of any evidence or allegations that meaningfully distinguish Plaintiffs' claims or compel a different conclusion, we must adhere to the results required by our precedent.[34] Thus, although we find that the U.S. citizenship and corporate status of Defendants, the U.S. interests implicated by Plaintiffs' claims, and the U.S. conduct alleged are relevant in considering whether Plaintiffs' claims have a U.S. focus and touch and concern the territory of the United States, we must conclude that, in these circumstances, those factors are not sufficient to displace the presumption against extraterritoriality. Accordingly, we do not have jurisdiction over Plaintiffs' ATS claims. In the absence of jurisdiction, the additional ATS issues raised by Plaintiffs are moot.

As a final note, we do not suggest that alternate legal standards or interpretations of *Kiobel* would be met here; indeed, Plaintiffs' allegations and

---

[34] *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (noting that our prior panel precedent rule requires adherence to the holding of an earlier panel, absent abrogation by the Supreme Court or reconsideration by this court sitting en banc).

evidence in support thereof may not be able to survive scrutiny for any number of reasons.[35]  Generally, plaintiffs in these suits face a veritable plethora of additional doctrinal, procedural, and evidentiary obstacles not addressed by this opinion, all of which may render the exercise of jurisdiction under the ATS impermissible, regardless of the presumption against extraterritoriality.  However, Congress passed the ATS to be actionable, "to have a practical effect."  *See Sosa*, 542 U.S. at 719, 124 S. Ct. at 2758.  Thus, even though we conclude that these particular Plaintiffs' claims are barred, caution is warranted with regard to the legal standards implemented in reaching that result.  As Justice Kennedy noted in *Kiobel*,

> Other cases may arise with allegations of serious violations of international law principles protecting persons, cases covered neither by the TVPA nor by the reasoning and holding of today's case; and in those disputes the proper implementation of the presumption against extraterritorial application may require some further elaboration and explanation.

569 U.S. at ___, 133 S. Ct. at 1669 (Kennedy, J., concurring).

Until such time as the Supreme Court considers the issue, it is our responsibility to perform the "further elaboration and explanation" envisioned by Justice Kennedy when considering cases that are not covered by the reasoning and holding of *Kiobel*.  *See id.*  We are presented with such a case here.  And in these

---

[35] For instance, after making several evidentiary findings, the district court below concluded that there was nothing left to support Plaintiffs' contention that Defendants "made decisions in the United States to conspire with and aid and abet the commission of war crimes in Colombia, no matter how one interprets the 'touch and concern' test."

circumstances, we must conclude that the presumption against extraterritoriality is not displaced. Neither this court nor the district court has jurisdiction to entertain Plaintiffs' ATS claims, and we affirm the district court's dismissal of the same.

### III. TORTURE VICTIM PROTECTION ACT CLAIMS

Plaintiffs also brought suit pursuant to the TVPA, a substantive Act that explicitly creates a cause of action for claims of torture and extrajudicial killing. *See* 28 U.S.C. § 1350 note § 2(a). Plaintiffs are entitled to bring separate TVPA claims based on the same underlying events as any claims simultaneously brought under the ATS; the TVPA provides an independent action for claims of extrajudicial killing and torture. *See Romero*, 552 F.3d at 1315 (permitting plaintiffs to seek relief for claims of extrajudicial killing under both statutes); *Aldana*, 416 F.3d at 1250–51 (finding that the TVPA provides a separate but not exclusive remedy for claims of torture). As such, even when claims brought under the ATS are unsuccessful, Plaintiffs' TVPA claims may potentially proceed on their own merit.

We consider the issues raised with regard to the TVPA in three parts. In Part A., we address whether we have jurisdiction to consider actions proceeding under the TVPA in the first instance. In Part B., we consider Plaintiffs' TVPA claims on appeal and affirm the district court's summary judgment dismissal of those claims based on our de novo review of the case. Our analysis would

48

normally end there.  However, the district court erroneously turned to international law to assess Plaintiffs' TVPA action, applying incorrect legal standards in dismissing their claims.  Thus, to prevent confusion as to which standards apply— both generally and specifically, in our affirmance of the district court's rulings in this case—we set forth and clarify the pertinent law in Part C.

## A. Jurisdiction

In contrast to the ATS, which can confer jurisdiction but does not include an independent cause of action, the TVPA provides a cause of action but contains no jurisdictional grant.  *See Romero*, 552 F.3d at 1315.  Our jurisdiction to consider Plaintiffs' TVPA claims is grounded, instead, in 28 U.S.C. § 1331, the general federal question jurisdiction statute.  *See id.*; *see also Sinaltrainal*, 578 F.3d at 1269 (determining that § 1331 conferred jurisdiction over TVPA claims); *Arce v. Garcia*, 434 F.3d 1254, 1257 n.8 (11th Cir. 2006) (noting that "we assume jurisdiction [for TVPA claims] under § 1331").  However, while we unquestionably have jurisdiction to consider Plaintiffs' TVPA claims, whether our jurisdiction is limited by the extraterritorial nature of Plaintiffs' claims requires further analysis.

Although we have not before had occasion to do so, we hold now that the TVPA applies extraterritorially.  The text of the TVPA itself indicates that actions may arise from conduct occurring outside the United States.  The Act provides for

49

the liability of any individual who acts "under actual or apparent authority, or color of law, *of any foreign nation*"; further, it contains an exhaustion of remedies requirement instructing courts to dismiss a claim if the plaintiff has not "exhausted adequate and available remedies *in the place in which the conduct giving rise to the claim occurred*." *See* 28 U.S.C. § 1350 note § 2(a)–(b) (emphasis added); *see also Chowdhury v. Worldtel Bangl. Holding, Ltd.*, 746 F.3d 42, 51 (2d Cir. 2014) (finding that the text's language "of any foreign nation" is best understood as addressing conduct that occurs in the territory of foreign sovereigns), *cert. denied sub nom. Khan v. Chowdhury*, ___ U.S. ___, 135 S. Ct. 401 (2014).

Accordingly, the Act itself gives "clear indication of an extraterritorial application." *See Morrison*, 561 U.S. at 255, 130 S. Ct. at 2877–78 (requiring "the affirmative intention of Congress clearly expressed to give a statute extraterritorial effect" (internal quotation marks omitted)); *see also Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1669 (Kennedy, J., concurring) (noting that "[m]any serious concerns with respect to human rights abuses *committed abroad* have been addressed by Congress in statutes such as the [TVPA]" (emphasis added)).

Although the text of the TVPA alone is sufficient to illustrate the Act's intended extraterritoriality, the legislative history fully supports this conclusion. *See, e.g.*, S. Rep. No. 102-249, at 3–4 (1991) (describing the TVPA as "providing a civil cause of action in U.S. courts for torture committed abroad"); *id.* at 5

("[W]hile the [ATS] provides a remedy to aliens only, the TVPA . . . extend[s] a civil remedy also to U.S. citizens who may have been tortured abroad."); *id.* ("Congress clearly has authority to create a private right of action for torture and extrajudicial killings committed abroad."); H.R. Rep. No. 102-367, at 3 (1991) ("Judicial protections agains[t] flagrant human rights violations are often least effective in those countries where such abuses are most prevalent. A state that practices torture and summary execution is not one that adheres to the rule of law. . . . The [TVPA] would respon[d] to this situation.").

Thus, we find that our jurisdiction over TVPA actions under § 1331 is not constrained by the presumption against extraterritoriality, and we turn to our discussion of the merits of Plaintiffs' TVPA claims.

## B. Plaintiffs' TVPA Claims

Plaintiffs' claims can only proceed, if at all, against Tracy and Jimenez (jointly, the individual defendants).[36] Plaintiffs contend that Tracy and Jimenez are each legally responsible—due to involvement with and support of the violent paramilitaries in the AUC—for the extrajudicial killings of Plaintiffs' decedents by the AUC. Plaintiffs sued Tracy and Jimenez under § 2 of the TVPA, which

---

[36] The TVPA does not authorize liability against corporate entities. *Mohamad*, 566 U.S. at ___, 132 S. Ct. at 1708. Plaintiffs do not contest the district court's dismissal of their TVPA claims against Drummond Company and Drummond Ltd.; regardless, any such challenge would fail pursuant to the Supreme Court's determination in *Mohamad*. *See id*. Also, Plaintiffs failed to brief any challenge to the district court's dismissal of their claims against all other individual defendants; they have thus abandoned those claims on appeal. *See Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004); *see also* Fed. R. App. P. 28(a)(5).

provides that a person who "subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death." [37]  28 U.S.C. § 1350 note § 2(a)(2).  By its terms, the TVPA supports claims based on theories of indirect liability.  *See, e.g.*, *Cabello*, 402 F.3d at 1157; *Aldana*, 416 F.3d at 1248; *Sinaltrainal*, 578 F.3d at 1258 n.5.

Tracy and Jimenez brought individual motions for summary judgment with regard to Plaintiffs' claims for extrajudicial killing in violation of the TVPA.  In response, Plaintiffs advanced several theories of liability, arguing that their claims should be permitted to proceed against the individual defendants under these theories.  Plaintiffs' proffered theories took several forms, including aiding and abetting, conspiracy, agency, and command responsibility.

In dispensing with Plaintiffs' TVPA claims, the district court made several findings that are relevant to the parties' arguments before us now.  The court found that international law controls the analysis of claims brought under the TVPA, leading it to reject Plaintiffs' agency theory of liability outright, apply a heightened mens rea standard to Plaintiffs' aiding and abetting theory of liability, and dismiss

---

[37] There is also a color of state law requirement for claims brought under the TVPA.  *See, e.g.*, *Romero*, 552 F.3d at 1317 (requiring proof of a "symbiotic relationship between a private actor and the government that involves the torture or killing alleged in the complaint to satisfy the requirement of state action" under the TVPA).  Here, the district court determined that the AUC's relationship with the Colombian government satisfied this requirement.

Plaintiffs' command responsibility theory.  After making these determinations and applying the standards it articulated, the district court found that Plaintiffs' admissible evidence did not raise a genuine issue of material fact as to either of the individual defendants' liability.  Subsequently, the court granted summary judgment to Tracy and Jimenez, respectively.

Plaintiffs appeal the grants of summary judgment, averring that the district court erred in its determinations.  In response, Tracy and Jimenez argue that Plaintiffs' evidence was simply insufficient to survive summary judgment; thus, the district court's entry of summary judgment should stand regardless of which body of law controls or what theories are available.  We agree with the individual defendants, and we affirm on that basis.[38]  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993) (finding that we may affirm the district court's grant of summary judgment if any adequate ground for doing so exists).

We have plenary review over the district court's summary judgment dismissals of Plaintiffs' TVPA claims against Tracy and Jimenez.  *See Romero*, 552 F.3d at 1313.  Disposition of the case by summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[38] Plaintiffs also argue the district court erred in refusing to consider certain witness testimony offered by Plaintiffs in opposition to the individual defendants' motions for summary judgment.  However, we do not find that the district court committed reversible error in its evidentiary rulings.  *See Macuba v. Deboer*, 193 F.3d 1316, 1324–25 (11th Cir. 1999) (finding that the district court should not consider evidence at summary judgment if it would not be admissible at trial).

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Fitzpatrick*, 2 F.3d at 1115 (quoting Fed. R. Civ. P. 56(c)).

As relevant here, when the summary judgment movant does not bear the burden of proof at trial, the movant may show "that there is an absence of evidence to support the non-moving party's case"; a negation of the non-moving party's claim is not required. *See id.* at 1115–16 (internal quotation marks omitted). If the movant shows that there is an absence of evidence, the non-moving party who bears the burden of proof at trial must contradict this showing by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Id.* at 1116. In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17.

At summary judgment in the proceedings below, Tracy and Jimenez demonstrated an absence of evidence in support of Plaintiffs' case. They proffered that, with discovery at an end, Plaintiffs had not uncovered any evidence to support liability. Specifically, there was no admissible evidence that either Tracy or Jimenez had any knowledge of an alleged corporate scheme to fund or otherwise support the AUC, much less that they had any part in such a scheme or control over those who allegedly did.

54

At this point, Plaintiffs could not rely upon mere allegations to survive summary judgment, but were required to either point out evidence in the record or provide additional evidence in support of their claims sufficient to withstand a directed verdict motion. *See id.* at 1116 n.3; *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249–50 (11th Cir. 2004) ("[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment."). Thus, we look to see whether Plaintiffs have produced any admissible evidence from which a jury could hold Tracy and Jimenez liable for the extrajudicial killings of Plaintiffs' decedents by the AUC.

Reviewing the record de novo, we find that Plaintiffs have failed to adduce any evidence creating a genuine issue of material fact as to Tracy's or Jimenez's liability for any alleged corporate scheme resulting in the killings of noncombatants along Defendants' mining operations and rail lines by the AUC. *See Fitzpatrick*, 2 F.3d at 1117. Even under the correct legal standards and construing the facts in the light most favorable to Plaintiffs, there is no factual basis to sustain liability for Plaintiffs' TVPA claims against the individual defendants.

By way of a brief example, the district court set forth a heightened mens rea standard for aiding and abetting liability, requiring purpose or specific intent rather than knowledge. Consequently, the district court incorrectly stated that Plaintiffs

must establish that the individual defendants "acted with the intent to have noncombatants murdered along Drummond's rail lines." As explained in more detail below, the district court should have instead looked for "active participation," which is supported if the defendants gave knowing substantial assistance to the individuals committing the wrongful act. *See Cabello*, 402 F.3d at 1157–59.

However, despite the more challenging mens rea requirement it articulated, the district court found that there was "no evidence that Tracy knew that noncombatants were being murdered along the rail lines," and further noted an "absence of any evidence of Tracy's knowledge that the AUC was allegedly being paid by Drummond." Similarly, the district court found that Plaintiffs had proffered no admissible evidence with regard to Jimenez's knowledge other than Jimenez's general awareness of the presence of the AUC and the AUC's violent methods.

While we reject the legal standard that the district court set forth, our independent review of the record supports the district court's factual findings as to the absence of evidence creating a genuine issue of fact. This forecloses Plaintiffs' claims even under the appropriate standard. *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S. Ct. 2505, 2511 (1986) (determining that an issue is only "genuine" if it is supported by the

evidence; it is not genuine if it is created by evidence that is "merely colorable" or "not significantly probative").

Plaintiffs' *allegations* paint a different picture, but those allegations, repeated before us here, do not bear out in the record. At the summary judgment stage, evidentiary support is required; no legal theories can sustain a claim in the absence of admissible evidence in support thereof. *See Fitzpatrick*, 2 F.3d at 1116–17; *see also Kesinger*, 381 F.3d at 1249–50. Our de novo review of the record supports the entry of summary judgment on Plaintiffs' TVPA claims against Tracy and Jimenez, and for this reason, we affirm the rulings of the district court.

## C. Applicable Legal Standards

Having found a sufficient basis to affirm the district court's entry of summary judgment, our inquiry would ordinarily end. However, the circumstances of this case require further discussion, since the district court applied the wrong substantive law when dismissing Plaintiffs' claims on summary judgment. This error is significant because, in determining whether a genuine issue of material fact precludes summary judgment, "[t]he substantive law applicable to the case determines which facts are material." *See Fitzpatrick*, 2 F.3d at 1115.

Accordingly, *our* finding that there are no genuine issues of material fact is premised on the application of the correct substantive law. *See id.* at 1117. Thus, we discuss the relevant legal standards raised on appeal to demonstrate the basis on

which we affirmed the entry of summary judgment in the current case and to clarify the applicable law for future actions proceeding solely under the TVPA.[39]

In the proceedings below, the district court mistakenly looked to international law to interpret the TVPA, leading to additional incorrect legal determinations with regard to Plaintiffs' TVPA claims. We correct these errors, finding as follows: (1) the interpretation of the TVPA is governed by its text, legislative history, and general principles of U.S. law; (2) theories of liability recognized in U.S. law are available to TVPA claimants; (3) the mens rea standard for an aiding and abetting theory of liability in this circuit is knowledge; and (4) the command responsibility doctrine is an available theory of liability contingent on sufficient allegations of authority and control. We address our reasons for these findings and precedent in support thereof in the order listed.

**(1) Interpreting the TVPA**

Preliminarily, the district court refused to recognize theories of liability for Plaintiffs' TVPA claims if the theories were "not accepted in international law," a view which Defendants urge us to adopt in assessing Plaintiffs' claims on appeal.

---

[39] Given recent developments with regard to the ATS, it is likely that more claims will be brought solely under the TVPA. Although plaintiffs frequently bring (and we have subsequently considered) claims under the ATS and the TVPA concurrently, the two causes of action have certain differences, ones that became apparent and important in this case. *See, e.g.*, *Baloco I*, 640 F.3d at 1345 (noting that "[t]he TVPA differs from the ATS in certain crucial ways"); *Aldana*, 416 F.3d at 1252 (noting that dissimilarities between the ATS and TVPA "might actually make a difference" in some cases).

However, international law does not determine our interpretation of the TVPA. The TVPA and claims brought thereunder are governed by its language, its legislative history, and general principles of domestic law.[40]  Our interpretation and application of the TVPA make this abundantly clear.  *See, e.g.*, *Baloco I*, 640 F.3d at 1348–50 (examining the TVPA's text, purpose, and legislative history to interpret the TVPA and applying state wrongful death law, without reference to customary international law); *Cabello*, 402 F.3d at 1159 (defining accessorial liability as set forth in the federal common-law context).

Indeed, on the rare occasions when we *do* look to general principles of international law for guidance as to what a theory of liability or statutory definition requires, we do so *only* because the TVPA itself implicitly or explicitly incorporated those principles from international law.  *See Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1289 (11th Cir. 2002) (looking to international law for guidance as to the elements of command responsibility because "legislative history makes clear that Congress intended to adopt the doctrine of command responsibility from international law as part of the [TVPA]"); *see also* S. Rep. No.

---

[40] *See, e.g.*, *Mohamad*, 566 U.S. at ___, 132 S. Ct. at 1709 (noting that "Congress is understood to legislate against a background of common-law adjudicatory principles" unless it plainly overrides those principles (internal quotation marks omitted)); *Kiobel*, 569 U.S. at ___, 133 S. Ct. at 1669 (Kennedy, J., concurring) (noting that TVPA "cases will be determined in the future according to the detailed statutory scheme Congress has enacted").

102-249, at 10 (noting that interpretation of the exhaustion of remedies requirement "should be informed by general principles of international law").

In other places, the legislative history instead directs us to domestic law; we are told to apply "principles of liability under U.S. civil rights laws, in particular [42 U.S.C. §1983], in construing 'under color of law' as well as interpretations of 'actual or apparent authority' derived from agency theory in order to give the fullest coverage possible." *See, e.g.*, S. Rep. No. 102-249, at 8.

The district court found that the Supreme Court's decision in *Sosa* compelled it to look to customary international law and restrict the theories of liability available to TVPA plaintiffs. However, *Sosa* is inapplicable here. First, *Sosa* warned courts to exercise "vigilant doorkeeping" when considering whether to recognize new *causes of action* under the ATS (that is, new "law of nations" violations). *See Sosa*, 542 U.S. at 725–29, 124 S. Ct. at 2762–64. Even in ATS cases, we have not clearly applied this constraint to our recognition of legal *theories of liability* for existing causes of action under the ATS. Second, *Sosa* only applies to the ATS; it has no effect on the causes of action explicitly set forth in the TVPA or the theories of liability recognized in support thereof. [41]  *See, e.g.*, *Sinaltrainal*, 578 F.3d at 1263–64 (noting ways in which "[t]he TVPA is broader

---

[41] Defendants confuse the ATS and TVPA, as did the district court. While international law is crucial to the ATS analysis, *see supra* Part II(A)(1), the TVPA sets forth the prohibited behavior within the Act itself. Contrary to claims brought under the ATS, claims under the TVPA are in no way dependent on a violation of customary international law.

than the ATS"); *Aldana*, 416 F.3d at 1252 ("[N]either Congress nor the Supreme Court has urged us to read the TVPA as narrowly as we have been directed to read the [ATS].").

Thus, international law does not set the standard for TVPA claims; instead, the TVPA should be interpreted through reference to its text, legislative history, and general principles of domestic law.  Again, we have used this approach repeatedly in our precedent.  For example, when we were recently required to interpret the TVPA, we examined the plain text of the Act, its purpose, and its legislative history to address whether the claimants before us had a cause of action. *See Baloco I*, 640 F.3d at 1345–47.  After determining that, as a general matter, wrongful death claimants are eligible to bring suit for damages under the TVPA, we then turned to whether the plaintiffs in the case before us were in fact proper wrongful death claimants.  *See id.* at 1348–49.  Since the TVPA did not indicate whether "Congress intended state law or federal law" to provide the answer, we considered the legislative history of the Act.  *See id.* at 1348–50.

We found congressional intent "that state law should govern the determination . . . and, where state law would provide no remedy, a court may apply the foreign law that would recognize the plaintiff's claim."  *See id.* at 1349.  Thus, determining who could be a claimant in the action at hand implicated the conflict laws of Alabama and the substantive wrongful death law of Colombia.

*See id.* At no point in this analysis did we consult customary international law—not to determine what cause of action was available, nor who could sue, nor whether federal or state law would govern the applicable requirements. *See id.* at 1349–50.

**(2) Theories of Liability under the TVPA**

Further, since domestic law sets the standards for the TVPA, secondary or indirect theories of liability recognized by U.S. law are available for claims brought under the TVPA.[42] The TVPA contemplates liability against those who did not "*personally* execute the torture or extrajudicial killing." *See Mohamad*, 566 U.S. at ___, 132 S. Ct. at 1709 (emphasis added); *Aldana*, 416 F.3d at 1248 ("[T]he [TVPA] reaches those who ordered, abetted, or assisted in the wrongful act."); *see also Chowdhury*, 746 F.3d at 52 (noting that agency law "can provide a theory of tort liability if a defendant did not personally torture the victim").

Importantly, the TVPA and its legislative history in no way disavow reliance on traditional theories of tort liability for secondary actors under the TVPA. *See Meyer v. Holley*, 537 U.S. 280, 287, 123 S. Ct. 824, 829 (2003) ("Where Congress . . . has not expressed a contrary intent, the Court has drawn the inference

---

[42] Because the district court below turned to international law, it incorrectly held that ratification, a secondary liability theory from agency law, could not support liability under the TVPA. However, "[t]he weight of authority makes clear that agency theories of liability are available in the context of a TVPA claim." *See, e.g.*, *Chowdhury*, 746 F.3d at 52, 53 n.11 (affirming a jury verdict predicated on agency theories of liability, including ratification).

that it intended ordinary rules to apply."). To the contrary, the legislative history endorses an expansive view of liability under the TVPA: "[R]esponsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts—anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them." S. Rep. No. 102-249, at 9. Thus, theories of liability under domestic law are available to support TVPA claims by providing a theory of tort liability when the defendant did not personally commit the underlying act.[43]

### (3) Standards for Aiding and Abetting Liability

When considering whether the secondary theories of liability are met, we turn to federal common law for the relevant standards. Our opinion in *Cabello*, 402 F.3d 1148, forms the basis for aiding and abetting liability in this circuit. *See Romero*, 552 F.3d at 1315–16 (recognizing that our decision in *Cabello* binds all subsequent panels of this court as to aiding and abetting liability).

---

[43] The availability of and potential for success on these theories will be constrained, of course, by other relevant TVPA requisites. By way of example, both the TVPA's explicit state action requirement and federal pleading standards could prove problematic. In an earlier case, we noted the plaintiffs' "layered theory of agency and alter ego liability." *See Sinaltrainal*, 578 F.3d at 1259. We then dismissed the TVPA claims because the complaint did not state a facially plausible claim for relief; the "vague and conclusory allegations" of a conspiracy between purported state actors and the defendants "or their agents" did not meet the TVPA's state action requirement. *Id.* at 1270; *see, e.g.*, Roger P. Alford, *The Future of Human Rights Litigation After Kiobel*, 89 Notre Dame L. Rev. 1749, 1756 (2014) ("The likelihood that corporate officers acted under color of foreign law will be rare, and even assuming they did, pleading that fact as a plausible occurrence will be extraordinarily difficult in light of heightened federal pleading standards.").

In *Cabello*, we addressed whether claims based on secondary liability are actionable under the ATS and TVPA. 402 F.3d at 1157–60 (upholding a jury verdict premised on indirect liability claims under the ATS and the TVPA). We relied on persuasive authority from two other circuits to find that the ATS reaches conspiracies and accomplice liability. *See id.* at 1157. Turning to the TVPA, we found that the legislative history "indicates that the TVPA was intended to reach . . . those ordering, abetting, or assisting in the violation." *Id.* Thus, "the law of this Circuit permits a plaintiff to plead a theory of aiding and abetting liability under the [ATS] and the [TVPA]." *Romero*, 552 F.3d at 1315.

We then looked to federal common law to establish the requisite standards, incorporating the legal standards from *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983).[44] *See Cabello*, 402 F.3d at 1158–59. In so doing, we found that indirect liability for aiding and abetting required the plaintiffs to prove "active participation" by the preponderance of the evidence. *See id.* at 1158. Liability for "active participation" was supported if the wrongful act at the center of the claim was, in fact, committed, and the defendant gave knowing substantial assistance to the person or persons who committed the wrongful act. *See id.*; *see also*

---

[44] Although we explicitly cited *Halberstam* for conspiracy liability, we clearly incorporated and applied *Halberstam*'s aiding and abetting standards as well. In turn, *Halberstam* relied upon the Restatement (Second) of Torts to set the standards for aiding and abetting liability. *See Halberstam*, 705 F.2d at 478, 481, 487–88. The *Halberstam* decision has been cited approvingly by the Supreme Court as "a comprehensive opinion on the subject [of aiding and abetting]." *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181, 114 S. Ct. 1439, 1450 (1994).

*Halberstam*, 705 F.2d at 478 (aiding and abetting liability "focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct").

Thus, to affirm the jury verdict against the defendant, we looked for evidence of a "knowledge" mens rea and "substantial assistance" actus reus. *See id.* at 1158–59. We then applied this standard to find that the evidence sufficiently supported aiding and abetting liability. *See id.* at 1159 ("[T]he statements attributed to [the defendant] reflect his *knowledge* that he was assisting in wrongful activity." (emphasis added)); *id.* at 1158–59 (finding support for knowledge and substantial assistance because the defendant served as the primary perpetrator's bodyguard and was present when the perpetrator selected the files of the victims).

Accordingly, as reflected in our controlling precedent, the appropriate standard for aiding and abetting liability is knowing substantial assistance. *See id.* at 1158.

**(4) Command Responsibility Doctrine**

We turn now to the superior or command responsibility doctrine.[45] The district court's determination that Plaintiffs' claims against Tracy and Jimenez could not continue under this doctrine necessitates a more in-depth explanation.

---

[45] We have referred to this theory of liability as the command responsibility doctrine in our precedent, integrating the concept of the "superior" relationship into the elements we set forth therein, and thus we refer to it by this designation. *See Ford*, 289 F.3d at 1288–89.

Pertinent to our discussion here, the district court found that "[t]he theory has only been extended to civilians where those individuals had authoritative control over state-run military or public forces" and "decline[d] to extend the theory of command responsibility to officers of private corporations." To the extent that the district court's opinion may be construed as holding that, as a matter of law, command responsibility liability does not apply to Tracy and Jimenez simply due to their statuses as civilians and/or officers of a private corporation, we disagree. However, the doctrine is not broadly available to support liability under the TVPA. We address this issue separately to clarify.

As explained above, we generally do not look to international law for guidance with regard to the TVPA; however, when we do, it is because the TVPA or its legislative history instructs us to do so. This is one of those times. "[L]egislative history makes clear that Congress intended to adopt the doctrine of command responsibility from international law as part of the [TVPA]." *See Ford*, 289 F.3d at 1289. We have held that three indispensable elements are required to support liability under the command responsibility doctrine:

> (1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes.

66

*Ford*, 289 F.3d at 1288; *accord Chavez v. Carranza*, 559 F.3d 486, 499 (6th Cir.

2009).  In order to establish the first element (the "superior-subordinate

relationship"), plaintiffs must allege facts plausibly suggesting that the defendants

had "effective control" over the perpetrators.  *Ford*, 289 F.3d at 1290.

There is extensive support from international law and in the text, legislative

history, and jurisprudence of the TVPA for civilian liability under the command

responsibility doctrine.[46]  *See, e.g.*, *Doe v. Qi*, 349 F. Supp. 2d 1258, 1330–31

(N.D. Cal. 2004) (examining the text and legislative history of the TVPA to find

that the Senate "implicitly endorsed the application of command responsibility to

acts of torture and extrajudicial killings whether committed by military or civilian

forces" and did not "limit its applicability to acts of military officials or the context

of war"); Brief of Amici Curiae International Criminal Law Scholars in Support of

Plaintiffs-Appellants at 6–18, *Doe v. Drummond Co.*, No. 13-15503 (11th Cir. filed

May 1, 2013) (citing numerous cases wherein civilians, including private business

owners, have been found liable under this doctrine in customary international law

and in current international tribunals).

---

[46] Again, since the doctrine is adopted from international law, we turn thereto for guidance; both criminal and civil cases from international law may be persuasive.  *See Ford*, 289 F.3d at 1289 & n.6 (using criminal cases to interpret the doctrine in the absence of congressional intent for "courts to draw any distinction in their application of command responsibility in the civil arena").

Thus, a civilian superior—including a civilian corporate officer—could *feasibly* be held liable under the doctrine provided the plaintiffs demonstrated a superior-subordinate relationship between the civilian and the perpetrator, averring that the civilian was in the requisite position of authority and control. *See, e.g.*, *Ford*, 289 F.3d at 1291; *id.* at 1298 (Barkett, J., concurring) ("[I]nternational law provides that an official without legal authority may be held responsible for others' violations of international law where that official exercised a degree of control sufficient to confer *de facto* authority.").

The question of whether this doctrine is available, then, is not answerable simply by assessing "who is being controlled by whom"; nor is it broadly available to be used by all plaintiffs against all defendants under the TVPA. Instead, this doctrine is available if the requisite degree of responsibility, authority, and control is present to support liability.[47] *See id.* at 1291 (majority opinion) ("Proof is required that the superior has effective control over the persons committing the violations of international humanitarian law in question, that is, has the material ability to prevent the crimes and to punish the perpetrators thereof." (internal

---

[47] Of course, the other requirements of the TVPA must be satisfied as well, and there are additional hurdles that could prove prohibitive for future plaintiffs proceeding on such a theory. For example, if neither the superior nor the subordinate are acting on behalf of or in close connection with a state, the plaintiff may have difficulty establishing that the claim comports with the TVPA's state action requirement; or, if the secondary liability of the superior must rest on another secondary liability theory, the application of the doctrine may be too attenuated or the act too remote to support liability. The command responsibility doctrine is, however, merely one theory of potential liability—the absence thereof does not negate a TVPA claim under an alternate theory of liability. *See Cabello*, 402 F.3d at 1157.

68

quotation marks omitted)); *id.* at 1297–98 (Barkett, J., concurring) ("A *de facto* superior is an official who exercises powers of control over subordinates that are substantially similar to those exercised by *de jure* authorities." (internal quotation marks omitted)); *see also Qi*, 349 F. Supp. 2d at 1330–31.  Therefore, although this doctrine was not sustainable to support liability in the case before us, we do not foreclose the possibility that, under different circumstances, the doctrine of command responsibility may afford a basis for liability of a private corporate officer in a TVPA claim.[48]

On a concluding note, we acknowledge that TVPA claimants may face significant hurdles in bringing suit against individuals employed by or working on behalf of a company rather than the corporate entity itself.  The Supreme Court recognized numerous factors that make these claims challenging; for example, "[v]ictims may be unable to identify the men and women who subjected them to [the violation], all the while knowing the organization for whom they work." *Mohamad*, 566 U.S. at ___, 132 S. Ct. at 1710.  And here, Plaintiffs may have encountered at least one of these challenges in pursuing their claims; their allegations did not yield sufficient admissible evidence after discovery to sustain

---

[48] In these circumstances, the command responsibility doctrine could not sustain Plaintiffs' claims.  Specifically, Plaintiffs failed to produce any evidence that plausibly supports the first element of the doctrine, the superior-subordinate relationship, which requires that the defendants have "effective control" over the perpetrators. *See Ford*, 289 F.3d at 1288, 1290. The record does not reflect that Tracy or Jimenez were in a position of authority or control such that either defendant could be held legally responsible as either *de facto* superiors or *de jure* authorities for actions that were ultimately committed by the AUC. *See id.* at 1290–91.

69

their TVPA action against the individual defendants.  Nonetheless, this is the legislative scheme in which TVPA plaintiffs must operate.  *See id.*  Given that our independent review of the record presents no triable issue of fact as to liability, we affirm the district court's dismissal of Plaintiffs' TVPA claims.

## IV. COLOMBIAN LAW WRONGFUL DEATH CLAIMS

Finally, Plaintiffs have failed to present compelling grounds for reversal as to their remaining issues on appeal, which pertain to (a) the district court's refusal to exercise supplemental jurisdiction over their wrongful death claims based on Colombian law, and (b) the court's denial of their motion to vacate to pursue those same claims.[49]  We review both decisions for abuse of discretion.  *See Romero*, 552 F.3d at 1313–14 (supplemental jurisdiction); *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 741 F.3d 1349, 1351, 1355 (11th Cir. 2014) (motion to vacate).

Early in this litigation, the district court declined to exercise supplemental jurisdiction over Plaintiffs' wrongful death claims, finding that the claims presented sufficiently complex issues under Colombian law such that it would be impossible for the court to navigate and apply the Colombian law requisites.  Later, after the district court dismissed the remainder of Plaintiffs' claims, Plaintiffs moved to vacate the judgment.  Plaintiffs sought to amend their complaint to

---

[49] In the same order, the district court also refused to grant Plaintiffs leave to conduct limited discovery as to Defendants' actions in the United States.  Since Plaintiffs failed to raise any challenges in their initial brief to this court with regard to this issue, they have abandoned it on appeal.  *See Access Now, Inc.*, 385 F.3d at 1330; *see also* Fed. R. App. P. 28(a)(5).

70

dismiss Jimenez and achieve complete diversity, permitting Plaintiffs to proceed on their wrongful death claims based on Colombian law. The district court refused to allow such amendment, citing Plaintiffs' failure to seek reinstatement of those claims under diversity jurisdiction or to file them in Colombia four years earlier, when the district court originally dismissed them. The court concluded that re-opening those claims "would be extremely prejudicial and would require substantial additional expense, preparation, and discovery."

Under 28 U.S.C. § 1367, the supplemental jurisdiction statute, a district court may "decline supplemental jurisdiction when 'the claim raises a novel or complex issue of State law.'" *Romero*, 552 F.3d at 1318 (quoting 28 U.S.C. § 1367(c)(1)). In *Romero*, we noted that the district court had the benefit of "extensive briefing" with regard to Colombian wrongful death claims, but that it was "unable to reconcile conflicting translations of Colombian legal precedents, to navigate the complexities of the parties' submissions, or to discern . . . the Colombian law requisites for a wrongful death claim." *Id.* (internal quotation marks omitted). Consequently, in the *Romero* appeal, we affirmed the district court's discretionary decision to decline jurisdiction. *See id.*

Here, Plaintiffs argue that the district court below improperly concluded that their claims raised complex Colombian law issues by relying on another court's decision, one that was only reached after "extensive briefing" on the matter.

71

However, they have pointed us to no law that compels the conclusion that the district court's decision was a clear error of judgment. After the district court explicitly noted that it had considered the briefs and evidentiary submissions before it, the court properly considered our guidance in *Romero* and concluded that the similar claims herein raised "sufficiently complex" issues, rendering it "impossible for th[e] court to navigate the Colombian law requisites." The district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the wrongful death claims.

Plaintiffs also appeal the district court's denial of their motion under Federal Rule of Civil Procedure 60(b)(6) to vacate the judgment and allow Plaintiffs to amend their complaint to perfect diversity and pursue Colombian law claims. Rule 60(b) is "the procedural means by which a party may seek relief from a final judgment." *Aldana*, 741 F.3d at 1355. Generally, relief may only be provided in specific circumstances such as mistake or fraud; however, as relevant here, the final provision of the rule "provides a catch-all, authorizing a court to grant relief from a judgment for 'any other reason that justifies relief.'" *Id.* (quoting Fed. R. Civ. P. 60(b)(6)). We have "carefully constrained this open-ended language." *Id.*

To warrant relief under Rule 60(b)(6), not only must Plaintiffs show "sufficiently extraordinary" circumstances, but also "that absent such relief, an 'extreme' and 'unexpected' hardship will result." *Galbert v. W. Caribbean*

*Airways*, 715 F.3d 1290, 1294–95 (11th Cir. 2013) (internal quotation marks omitted). Vacating a judgment to allow pursuit of claims under an alternate theory of liability is usually permissible under Rule 60(b)(6) "when unavailability is unforeseeable, such as when a foreign forum adopts a new rule." *Aldana*, 741 F.3d at 1357; *but see Ritter v. Smith*, 811 F.2d 1398, 1401 (11th Cir. 1987) ("[A] change in the law will not always provide the truly extraordinary circumstances necessary to reopen a case."). To require reversal of a district court's denial of a Rule 60(b)(6) motion on appeal, plaintiffs must "demonstrate a justification so compelling that the district court was required to vacate its order." *Aldana*, 741 F.3d at 1355 (internal quotation marks omitted).

Here, the district court dismissed Plaintiffs' ATS claims on the basis that they did not meet the new standard set in *Kiobel*. Assuming without deciding that the Supreme Court's decision in *Kiobel* constituted sufficiently extraordinary circumstances such that the district court could reopen the case, "[e]ven then, whether to grant the requested [Rule 60(b)] relief" was a matter for the district court's "sound discretion." *See id.* (alteration in original) (internal quotation marks omitted). We simply cannot say that it was an abuse of discretion to deny Plaintiffs' motion to vacate the judgment. Although granting Plaintiffs' motion would have been *permissible*, Plaintiffs have failed to "demonstrate a justification

so compelling that the district court was *required* to vacate its order."[50]  *See Galbert*, 715 F.3d at 1294 (emphasis added) (internal quotation marks omitted) ("It is not enough that the granting of relief might have been permissible, or even warranted; rather, the decision to deny the motion must have been sufficiently unwarranted as to constitute an abuse of discretion." (internal quotation marks omitted)).

We conclude that the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the Colombian wrongful death claims in the first instance or in refusing to vacate the judgment to allow Plaintiffs to amend their complaint so that they might pursue those same claims after the merits of the federal claims were dismissed.  Therefore, we affirm the district court's initial opinion dismissing Plaintiffs' wrongful death claims and its later opinion denying Plaintiffs' motion to vacate.

## V. CONCLUSION

Having consulted and considered the briefs, the record, and the applicable legal authorities, we affirm all rulings of the district court before us on appeal.

---

[50] While Plaintiffs rely on case law supporting that district courts should freely grant leave to amend, these cases do not support Plaintiffs' argument here.  The district court *did* grant Plaintiffs leave to amend, and did so more than once; further, the deadline to amend the pleadings passed several years prior to Plaintiffs' motion to vacate and amend.  *See Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (per curiam) (a district court is not required to allow amendment of the pleadings if there has been undue delay or when amendment would result in undue prejudice to the opposing party); *see also Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999) ("Prejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided.").

**AFFIRMED.**